George **KOHATSU**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 19738,

United States Court of Appeals
Ninth Circuit.

Oct. 22, 1965.

Rehearing Denied Dec. 2, 1965.

------

Laughlin E. Waters, Thomas L. Caps, Richard L. Mainland, Nossaman, Thompson, Waters & Moss, Los Angeles, Cal., for appellant.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Div., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Div., Jo Ann Dunne, Asst. U. S. Atty., Chief, Frauds Sec., Crim. Div., Los Angeles, Cal., for appellee.

Before CHAMBERS and DUNIWAY, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge:

This is an appeal from a judgment of conviction on four counts of a six count indictment. Counts One, Three and Five charged a violation of 26 U.S.C. § 7201 (willful attempt to evade or defeat income tax) for the years 1957, 1958, and 1959 respectively. Counts Two, Four and Six charged a violation of 26 U.S.C. § 7206(1) (willful falsification of income tax return under penalty of perjury) for the same years. Appellant was acquitted on Counts One and Two involving the year 1957 and convicted on the remaining counts involving the years 1958 and 1959.

Appellant was a member of a partnership engaged in farming and related enterprises, including the operation of a farm labor camp. In 1958 and 1959 the partnership also constructed a trailer park. Appellant was actively engaged in the management of the partnership and maintained and prepared its financial records. His income was his distributive share of the partnership income.

It is undisputed that there was unreported income for the three taxable years, and that for 1957 and 1958 the amounts were substantial. The unreported income consisted of receipts from the sale of farm produce and from the farm labor camp operations, and excess depreciation on the trailer park in 1959. As counsel for the appellant state in their opening brief, the crucial issue was whether appellant's understatements of income were willful.

Appellant sets forth six specifications of error, two of which raise constitutional questions: (1) that evidence was admitted which had been obtained in violation of appellant's right to counsel under the Sixth Amendment,[1] in that appellant was deprived of counsel after the investigation had reached the "accusatory stage"; and (2) that evidence was admitted in violation of the Fourth [2] and Fifth Amendments,[3] in that investigative agents of the Internal Revenue Service failed to warn or advise appellant of his constitutional rights and privileges.

The investigation was commenced in June, 1960, when appellant's income tax return for 1958 was assigned to a revenue agent for audit. For approximately one year periodic meetings were held between appellant and the agent, Valgene

---

1. The Sixth Amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense."

2. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

3. The Fifth Amendment provides in part: "No person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of * * * liberty or property, without due process of law; * * *"

T. Stapley. During this period appellant turned over to Stapley numerous bookkeeping records and related materials.

On June 23, 1961, Stapley informed appellant that bank deposit records showed deposits in excess of income reported in appellant's 1958 tax return. At a meeting on July 17, 1961, appellant misrepresented to Stapley a cash payment alleged to have been made to the contractor for the construction of the trailer park.

At a meeting on July 27, 28 or 29, Stapley again told appellant that the receipts shown on the 1958 income tax return did not agree with the bank deposits. Appellant then informed Stapley that $40,500 in cash had been taken from a safe deposit box and deposited in one of the partnership accounts. This statement was reduced to writing and signed by appellant. It was admitted into evidence without objection. In his testimony at the trial appellant admitted that he did not have any cash in a safe deposit box.

In early August, 1961, the investigation was referred to Special Agent Charles Vitello of the Intelligence Division of the Internal Revenue Service. Stapley accompanied Vitello to a meeting with appellant on September 14, 1961, when Vitello presented his "credentials", which were examined by appellant. Vitello conducted a further investigation during September and October, meeting with appellant on September 14 and 20 and October 31. At these meetings he secured additional documents from appellant.

In late 1961, Vitello turned the investigation and various documents over to Special Agent John Lines. Lines continued the investigation, without meeting with appellant until May 10, 1963. On that day appellant had a "question and answer conference" with Special Agent Lines, which was also attended by another agent and a reporter of the Internal Revenue Service. Lines testified that he advised appellant "as to his constitutional rights" and told him that he did not have to "say anything or offer any document which might tend to incriminate him under any of the federal laws", and that "Mr. Kohatsu said that he understood". Appellant, however, testified that he first learned that he was being investigated with the possibility of criminal prosecution in August, 1963.

Conceding that an internal revenue agent has a right to determine a taxpayer's correct civil liability and in so doing to interrogate the taxpayer and examine his books and records, appellant contends that this "routine civil tax investigation" undergoes a fundamental change when (1) a revenue agent discovers facts indicating substantial unreported income, and (2) the facts are such that the revenue agent suspects fraud. It is appellant's position that when these events occur, the investigation "has begun to focus on a particular suspect" and that from that point "government agents have a duty to inform the taxpayer of his right to counsel, and that they must not elicit further incriminating evidence from the taxpayer until he has been informed of his constitutional rights in specific, understandable terms".

Appellant argues that the investigation "focused on appellant" not later than July 28, 1961, and certainly not later than early August, 1961, when Revenue Agent Stapley referred the investigation to Special Agent Vitello of the Intelligence Division. It is contended that thereafter the agents were no longer "merely attempting to determine appellant's correct tax liability", but rather were "attempting to elicit incriminating statements and documentary evidence from appellant for possible use in a subsequent criminal prosecution".

It is the Government's position that it was Stapley's duty as a revenue agent to audit appellant's returns to determine the correct tax liability for civil purposes, and that it was Vitello's duty as a special agent of the Intelligence Division to investigate alleged violations of matters relating to income tax and make a recommendation based upon his investigation. The Government contends that both agents were engaged in investigative ac-

tivities, and that the accusatorial stage had not been reached during any of their investigation.

In support of his contention that his constitutional rights were violated, appellant relies primarily upon Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.[4] Counsel have not cited, nor have we found, any cases applying either Massiah or Escobedo in a case involving an income tax investigation. It is necessary accordingly to consider rather precisely what was held in both cases and their impact upon a case of this nature.

In Massiah the defendant, under indictment for violation of the narcotic laws, had retained counsel and was free on bail when, out of the presence of his attorney, he made incriminating statements to a co-defendant, who, without Massiah's knowledge, had agreed to become a witness for the Government. The statements were overheard by federal agents who had installed radio equipment in the co-defendant's car. The court, in referring to the guarantee of the Sixth Amendment, said:

"We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (377 U.S. at 206, 84 S.Ct. at 1203).

In Escobedo the defendant made incriminating statements during a period of police interrogation after he was arrested and after his request to see his

attorney had been denied. In reversing his conviction, the Court said:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342, [83 S.Ct. 792, at 795, 9 L.Ed.2d 799], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (378 U.S. at 490, 84 S.Ct. at 1765).

In taking the phrase "focus on a particular suspect" out of context, appellant would extend the rule of Escobedo beyond any logical implication of the effect of that decision. The Supreme Court in Escobedo referred to an unsolved crime. The existence of the crime was apparent. The police were seeking to identify the offender. The accused had been taken into custody. In the instant case the essential question to be determined by the investigations of the revenue agents was whether in fact any crime had been committed. The accused had not been indicted or arrested.

A comparable situation was considered by this court in Irwin v. United States,

---

4. No objection was interposed on either constitutional ground at the trial. Appellant contends, however, that these errors may properly be considered by this court as "plain errors * * * affecting substantial rights" under Rule 52(b) F.R.Cr.P., particularly in view of the fact that Escobedo v. State of Illinois was decided subsequent to appellant's conviction.

If appellant's constitutional rights were in fact violated, this would be true. See United States v. Atkinson, 1936, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555; Morris v. United States, 9 Cir. 1946, 156 F.2d 525; Billeci v. United States, 9 Cir. 1961, 290 F.2d 628; Dickey v. United States, 9 Cir. 1964, 332 F.2d 773.

1964, 338 F.2d 770, 777, where the defendant, convicted of mail fraud, claimed his right to counsel had been violated when a postal inspector submitted an inquiry to the defendant's company and received from the company material connected with the fraudulent scheme. In holding that the evidence of the postal inspector was properly admitted, we said:

"At that time neither [of the defendants] had been indicted or arrested. The postal inspector was conducting an investigation to determine if appellants were engaging in an unlawful activity. The accusatorial stage of the proceeding had not yet been reached. This being true, the eliciting of the evidence described without revealing to appellants the identity of the investigator or advising them of their right to counsel, and without appellants then having the aid of counsel, was not violative of their rights under the Sixth Amendment, as construed and applied in Escobedo or Massiah or any other Supreme Court decision. Nor were they thereby denied any rights under the Fourth and Fifth Amendments, invoked in appellant's supplemental brief."

The same reasoning applies here with respect to appellant's claim of violation of constitutional rights under both the Sixth Amendment and the Fourth and Fifth Amendments.

Appellant recognizes that under "existing authorities" the "facts do not show sufficient affirmative fraud on the part of the Government agents" to render inadmissible the testimony of the agents and the documents and records they obtained from appellant. He argues, however, that under the "philosophy" of Escobedo, government agents must be "held to the duty, dating from the time they suspect the taxpayer of fraud, of informing him of the criminal nature of the investigation and his absolute constitu-

tional right to remain silent under the Fifth Amendment".

We find nothing in the Escobedo opinion or its "philosophy" which would impose this duty upon revenue agents during their investigation of a taxpayer's tax returns and records. It is clear that all statements made and all documents delivered were voluntary acts of the appellant and were not induced by stealth, trickery or misrepresentation. As the court well said in United States v. Sclafani, 2 Cir., 1959, 265 F.2d 408, 414–415, cert. den. 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534:

"A 'routine' tax investigation openly commenced as such is devoid of stealth or deceit because the ordinary taxpayer surely knows that there is inherent in it a warning that the government's agents will pursue evidence of misreporting without regard to the shadowy line between avoidance and evasion, mistake and willful omission.

\* \* \* \* \* \*

"Moreover it is unrealistic to suggest that the government could or should keep a taxpayer advised as to the direction in which its necessarily fluctuating investigations lead. The burden on the government would be impossible to discharge in fact, and would serve no useful purpose." [5]

All of the agents properly identified themselves to appellant and disclosed their purpose to audit his returns. Appellant was fully apprised of the Government's concern with the accuracy of his returns. We find no violation of any of his constitutional rights.

Appellant contends that the trial court erred in excluding expert testimony of an accountant regarding appellant's bookkeeping errors. The errors are conceded, but it is argued that the testimony should have been received in support of appellant's defense that his "understate-

5. See also Hanson v. United States, 8 Cir. 1950, 186 F.2d 61; Legatos v. United States, 9 Cir. 1955, 222 F.2d 678; Greene v. United States, 2 Cir. 1961, 296 F.2d 841, vacated and remanded on other grounds, 369 U.S. 403, 82 S.Ct. 852, 7 L. Ed.2d 841.

ments of income" resulted from his carelessness and lack of competence as a bookkeeper and not from a willful attempt to evade his income tax.

The appellant used the so-called "Ideal System", a simple type of bookkeeping showing entries in "income received" and "expenses paid" columns. Appellant testified regarding the manner of keeping his books and the methods and procedures followed. He was interrogated on both direct and cross-examination regarding specific entries and his failure to make various entries. Government witnesses were also cross-examined with respect to mathematical errors in appellant's bookkeeping records. Some of these errors were against the taxpayer and some were against the Government. It is apparent from all of this testimony that appellant made many mathematical errors in his computations and that he did not make his entries on a regular systematic basis.

■ Appellant argues that the expert accountant who had made a thorough analysis of appellant's books and records should have been permitted to testify to "his observations concerning the manner in which appellant kept his 'Ideal System' ".[6] In his reply brief appellant argues that he was attempting to show by expert testimony *facts* (not opinion) "that appellant made numerous mistakes in keeping his books, from which the jury could infer a lack of willfulness."[7]

■■ As noted supra, there was substantial evidence in this case that errors were in fact made. No expert testimony was necessary to show these *facts.* There was also substantial testimony from the appellant himself as to the *manner* in which he kept his books. It was for the jury to determine whether the errors and the failure to report income resulted solely from bookkeeping carelessness or from a willful attempt to evade income tax. The accountant's opinion or conclusion that the errors resulted from appellant's carelessness, without intent to evade his income tax, would have been improper as going beyond the scope of his expert competence.[8] Viewing the evidence as a whole, we conclude that there was no prejudicial

6. The purpose of the testimony is set forth in the following colloquy:

"MR. CAPS: Would you hand the witness Exhibit Z, please, the Ideal book.

(Document handed to the witness.)

"BY MR. CAPS:

Q During your audit and review of the books and records of George Kohatsu, did you have occasion to familiarize yourself with Exhibit Z in front of you?

A I certainly did.

Q What did you find regarding the manner in which that record was kept?

A There are many instances—

MRS. DUNNE: Your Honor, I am very sorry to renew this objection, but I do not see any relevancy for telling the manner in which this record is kept. The issue is what income was reported or not reported, and what tax liabilities there are.

THE COURT: The objection is sustained.

MR. CAPS: There is no issue with respect to the amount of income that was reported; the only issue in this case is the reason for the omission, and I submit that in this respect that the bookkeeping records and the manner in which they were kept is of vital importance to the defendant.

THE COURT: The objection is sustained."

7. Appellant relies upon a number of civil tax cases holding that it is proper to consider the taxpayer's carelessness and ineptitude in keeping books in determining the issue of willfulness. It was proper for the jury to consider the numerous errors in bookkeeping in determining the issue of willfulness in this case. While the court's instructions on this point are not a part of the record, no exceptions were taken to the instructions, and presumably the jury was properly instructed with respect to the issue of willfulness.

8. It is of course recognized that an expert accountant may properly summarize voluminous records and interpret and explain certain evidence within the province of his expert competence. Cf. United States v. Willis, 3 Cir. 1963, 322 F.2d 548, and cases there cited. See also Bostwick v. United States, 5 Cir. 1955, 218 F.2d 790; Blumberg v. United States, 5 Cir. 1955, 222 F.2d 496.

error in excluding the accountant's testimony.

Appellant next argues that the trial court erroneously excluded testimony of the appellant and another witness offered to show that appellant cooperated with Government agents during the investigation. He relies primarily upon the cases of United States v. Matot, 2 Cir. 1944, 146 F.2d 197, and Heindel v. United States, 6 Cir. 1945, 150 F.2d 493. Both cases are distinguishable for the reasons set out in Hayes v. United States, 10 Cir. 1955, 227 F.2d 540, 543,[9] where the court said:

"When acts of subsequent conduct are offered to prove absence of evil intent, the trial court is vested with considerable discretion in admitting or refusing to admit such evidence. At best, the offer to pay after the defalcation or fraud has been established has but small probative value for the purpose of showing lack of evil intent. The trial court must consider the circumstances surrounding the offer and its exclusion of such evidence does not constitute reversible error, unless under all the circumstances of the case it clearly should have been admitted."[10]

After reviewing the evidence in this case, including the testimony of the Government witnesses relative to their interviews with appellant, we conclude that appellant was not prejudiced by the exclusion of the offered testimony regarding his cooperation in the investigation.

Appellant next claims prejudicial error in comments of the trial court indicating (1) bad faith on the part of appellant's counsel, and (2) lack of probative force in appellant's evidence. Appellant specified three alleged improper comments of the court. No objection was taken to two of the comments.

From our examination of the record as a whole, including the comments specified by appellant, we find no prejudicial error.[11] The remarks did not convey to the jury any impression of the trial judge's personal feelings as to the guilt or innocence of appellant or impugn the integrity of either counsel. Moreover, at the close of the evidence, the court admonished the jury to disregard any comment which might indicate his opinon regarding the case.[12]

9. In distinguishing Matot and Heindel the court noted that in both cases the defendant had made a prompt effort to rectify the situation as soon as his wrongdoing was brought to light, whereas in Hayes the defendants made no effort to pay the tax until some years after the alleged fraud was brought to their attention. In the instant case the excluded testimony related to events occurring long after the Government began its investigation and at a time when the defendant knew his returns were being audited.

10. See also Bateman v. United States, 9 Cir. 1954, 212 F.2d 61, 68, where this court in a tax fraud case held that the trial court had properly excluded evidence that the taxpayers had filed petitions in the Tax Court protesting the assessment of tax deficiencies, on the ground that the offered evidence had "no probative value in establishing appellants' state of mind at the time of the alleged criminal act * * *". We said further: "Furthermore, the acts appellants rely upon to show good faith in 1946 and 1947 occurred in 1950, long after the Government had commenced its investigation and at a time appellants knew their returns were being audited." (212 F.2d at 69).

11. As this court said in Bush v. United States, 9 Cir. 1959, 267 F.2d 483, 488: "Merely because a statement is made or question asked by court or counsel in the heat of a spirited trial which subsequently in the cool ivory tower of appellate court chambers seems inappropriate, does not make the stating nor the asking prejudicial error." See also Todorow v. United States, 9 Cir. 1949, 173 F.2d 439.

12. The court said:
"You are instructed that if I have said or done anything which has suggested to you that I am inclined to favor the claims or position of either party, you will not suffer yourself to be influenced by any such suggestion. I have not expressed, nor intended to express, nor have I intimated or intended to intimate, any opinion as to what witness-

Finally, appellant contends that the trial court erroneously restricted appellant's cross-examination of certain Government witnesses. It is well settled that the extent of cross-examination rests in the sound discretion of the trial judge.[13] From our examination of the record we are satisfied there was no abuse of that discretion.

Finding no prejudicial error, we affirm.

es are, or are not worthy of belief, what facts are or are not established; or what inferences should be drawn from the evidence. If any expression of mine has seemed to indicate an opinion relating to any of these matters, I instruct you to disregard it."

13. See Beck v. United States, 9 Cir. 1962, 298 F.2d 622, 629; Enriquez v. United States, 9 Cir. 1961, 293 F.2d 788, 794; Robles v. United States, 9 Cir. 1960, 279 F.2d 401, 405, and cases there cited.