**UNITED STATES of America,
Plaintiff,**

**v.**

**Thomas Kimball HILL, Defendant.**

**Crim. No. 36501.**

United States District Court
S. D. California, S. D.

Sept. 29, 1966.

Manuel L. Real, U. S. Atty., Larry L. Sipes, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Hewitt, Klitgaard & McMahon, San Diego, Cal., for defendant.

## MEMORANDUM

YOUNGDAHL, District Judge.

This case came before the undersigned, the defendant having waived jury trial, under a four-count indictment charging him with willful and knowledgeable evasion of income tax for the years 1959, 1960, 1961 and 1962. All the facts were stipulated, including the findings of fact set forth by Judge Carter in a pre-indictment civil proceeding wherein the defendant moved for the suppression and return of certain of his records and for a temporary restraining order against the Internal Revenue Service. Hill v. United States, Civil No. 3057, S.D.Cal., June 24, 1964. Judge Carter's findings in pertinent part are appended to this memorandum as Appendix A and are to be considered as a portion thereof. Also appended hereto as Appendix B are the Findings of Fact and Conclusions of Law of this Court.

In this case the only issue upon which the Court must rule is a motion by the defendant for the suppression and return of certain business records and information obtained from the defendant, an oral surgeon, in alleged violation of his constitutional rights under the fourth, fifth and sixth amendments of the Constitution of the United States. Other matters in this criminal tax fraud case have been settled by stipulation. This very issue was previously decided adversely to defendant in the pre-indictment civil proceeding before Judge Carter in 1964. His finding that no constitutional rights had been violated was subsequently upheld by the Court of Appeals for the Ninth Circuit. 346 F.2d 175 (1965). The Supreme Court denied certiorari. 382 U.S. 956, 86 S.Ct. 433, 15 L.Ed.2d 361 (1965).

Now the government has begun a criminal prosecution and the defendant has again moved to suppress. The present motion must be considered in the light of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966). These cases were decided subsequent to Judge Carter's 1964 findings.

In Escobedo the Court stated, "We hold only that when the process shifts from investigatory to accusatory— when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." 378 U.S. at 492, 84 S.Ct. at 1766.

The defendant urges that the entire inspection of his financial dealings by the Internal Revenue Service was not investigatory but accusatory in nature. Furthermore, the defendant asserts, because the process had become accusatory and because the Internal Revenue agents failed in their affirmative duty to issue the constitutional warnings required by Miranda, a large part of the records and information turned over by him to the Internal Revenue Service should be suppressed and returned.

The facts pertinent to the instant case begin on June 12, 1963, when Internal Revenue Agent Corwin B. DeVotie, in the course of making a civil audit of defendant's 1961 tax return, telephoned the defendant and arranged a meeting at the defendant's dental offices for June 17, 1963, in order to discuss this return. At the meeting Agent DeVotie introduced himself, presented his credentials, and received certain of the defendant's professional records which had been previously requested in the telephone conversation. Agent DeVotie proceeded to examine these records in one of the defendant's offices while the latter tended patients and generally conducted his normal affairs in other rooms on the same premises. The agent noted certain understatements of income but did not mention them to the defendant.

At all times during this initial meeting and his subsequent contacts with the Internal Revenue Service, defendant was as helpful as possible, volunteering information and records and orally expressing his desire to be cooperative.

■ On October 18, 1963, the pair met in the defendant's offices, at which time Agent DeVotie asked defendant Hill to explain certain discrepancies between his 1962 return, on the one hand, and his 1960 and 1961 returns, on the other. In response defendant stated in effect that he had been waiting for this moment to come and that he was glad that it was out in the open. Several days later, defendant voluntarily surrendered additional documents to Agent DeVotie. Shortly after this meeting, Agent DeVotie referred the matter to his superiors with the suggestion that the possibility of tax fraud existed.[1]

On January 8, 1964, Special Agent Edwin H. Wordell of the Intelligence Division of the Internal Revenue Service was assigned to the case. A few days later, he conferred with Agent DeVotie in order to familiarize himself with the case.

Following a telephone call to defendant on January 21, 1964, Agent DeVotie presented Agent Wordell to the defendant in his dental offices the next day. Agent Wordell was introduced as a Special Agent of the Intelligence Division of the Internal Revenue Service and his credentials were examined by the defendant who again expressed his willingness to cooperate with the investigation. Upon request defendant voluntarily turned over certain records to Agent Wordell for further examination at the Internal Revenue Service offices in San Diego.

On February 26, 1964, at Agent Wordell's invitation, the defendant came to the Internal Revenue Service offices in San Diego and was orally warned of his constitutional rights as set forth in *Miranda*.

It must be decided by this Court whether the *Miranda* warnings given on February 26 were given too late—that is, should the constitutional warnings required by *Miranda* have been given prior to February 26.

This Court is convinced that the *Miranda* case does not apply to this situation and that none of the defendant's constitutional rights have been violated.

Defendant's entire case is based on the premise that the shadowy boundary between "investigatory" and "accusatory" was crossed by the government before February 26, 1964. Since *Escobedo* was handed down in 1964, there has been much discussion and confusion over the interpretation of these two terms. Defendant in the instant case attempts to pinpoint the shift to "accusatory" by presenting evidence concerning the intent of the Internal Revenue Service as displayed in certain of its manuals, interoffice manuals, and the testimony on cross-examination of the two agents. It is urged that the process became accusatory not later than the October 18, 1963, "confession" of defendant.

On the other hand, the government, making use of the testimony of the agents, contends that the process was investigatory at least until February 26, 1964; that at the outset the investigation was civil in nature; and that the Internal Revenue's activities after October 18 were aimed at corroboration of prior disclosures and a decision as to whether to prosecute.

■■ The utilization since *Escobedo* of just such evidentiary methods as these to determine when certain constitutional rights attach has created much confusion. This Court believes that the Supreme Court has sought to dissipate this confusion by making use of a more objective test:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

---

1. Both understatement and intent must be present in order to commit a criminal tax fraud. 26 U.S.C. § 7201.

privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.* 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis supplied). In a significant footnote, the Court added, "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." *Ibid.* There are numerous other references in the decision to "custodial interrogation," "custodial surroundings," "settings in which their freedom of action is curtailed," and "taken into custody or otherwise deprived of his freedom."

This Court recognizes that *Miranda* extends *Escobedo* beyond the specific station house detention facts of that case. However, it does not believe that *Escobedo* has been extended to cover every situation where a crime has been committed and the spotlight has focused on a prime suspect. The language of *Miranda* makes it clear that there must be some form of detention, some type of in-custody situation before the proper constitutional warnings must be given.

█ Defendant in the instant case was never "deprived of his freedom of action in a significant way." *Ibid.* His meetings with the agents were by appointment only; except for the occasion on which the constitutional warnings were given, all meetings were in defendant's offices; he was free to come and go as he pleased and in fact did tend patients while his records were being reviewed. This situation is in direct contrast with the techniques of interrogation described in various police manuals relied upon in *Miranda*. *Id.* at 448–455, 86 S.Ct. 1602. A private interview without interruption in the office of the interrogator in which the interrogator displays complete certainty in the guilt of the accused is suggested. None of these factors are present in this case. This Court can see no way in which the facts of this case can be brought within the purview of *Miranda*.

What case law there is on this subject is pre-*Miranda* but appears to go along with the view of this Court. Recently the Court of Appeals for the Ninth Circuit has twice rejected similar claims by taxpayers involved in criminal tax fraud cases that their constitutional rights had been violated in the course of Internal Revenue Service investigations. Kohatsu v. United States, 351 F.2d 898 (1965), cert. denied, 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966); Rickey v. United States, 360 F.2d 32 (1966). The Court of Appeals for the Seventh Circuit has ruled similarly. United States v. Spomar, 339 F.2d 941 (1964).

In *Kohatsu* the defendant argued "that under the 'philosophy' of Escobedo, government agents must be 'held to the duty, dating from the time they suspect the taxpayer of fraud, of informing him of the criminal nature of the investigation and his absolute constitutional right to remain silent under the Fifth Amendment'". 351 F.2d at 902. The Court answered:

> We find nothing in the Escobedo opinion or its "philosophy" which would impose this duty upon revenue agents during their investigation of a taxpayer's tax returns and records. It is clear that all statements made and all documents delivered were voluntary acts of the appellant and were not induced by stealth, trickery or misrepresentation.

*Ibid.* This Court can see no distinguishing factor between the *Kohatsu* situation and claims and those in the instant case and, bearing *Miranda* in mind, still concurs in the reasoning of the Circuit Court.[2]

2. Certiorari was denied in *Kohatsu*, 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966), one week after *Miranda* was decided. Although the denial of a writ of certiorari ordinarily is not to be interpreted as approval or disapproval by the Supreme Court of a lower court decision, it is interesting to note that Mr. Justice Douglas, a member of the five-to-four majority in *Miranda*, felt that in *Kohat-*

Although the matter was not specifically raised at trial, this Court feels obligated to point out that, even without an in-custody *Miranda* situation, government authorities—the Internal Revenue Service in this instance—must scrupulously avoid violating any individual's fourth or fifth amendment rights. In this case there was no pre-custody violation of the defendant's constitutional rights. There was no stealth, misrepresentation, fraud, or deceit on the part of the agents. They told the defendant that they wished to examine his financial records in order to effectively investigate his tax returns. The defendant was under no compulsion. He voluntarily produced his records and answered the good-faith questions put to him by the agents. In so doing he made an intelligent and effective waiver of his fourth and fifth amendment rights as they existed in a non-custody situation. See, e. g., Carnley v. Cochran, 369 U.S. 506, 514–515, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); Johnson v. Zerbst, 304 U.S. 458, 464–465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

In view of the foregoing, the defendant's motion to suppress and return the evidence in question must be denied and the defendant is found guilty on each of the four counts in the indictment.

### APPENDIX A

The following constitute pertinent portions of Judge Carter's findings of fact in Hill v. United States, Civil No. 3057, S.D.Cal., June 24, 1964, which bear on the instant case:

On March 25, 1964, T. Kimball Hill, plaintiff herein, through his attorneys Hewitt, Klitgaard, Herney & McMahon, filed (a) Notice of Motion to Suppress and for Return of Evidence and Temporary Restraining Order; (b) Motion for Return of Seized Property and the Suppression of Evidence and Restraining Orders and (c) Petition in Support of Motion to Suppress and for Return of Documents and for Restraining Orders.

\* \* \* \* \* \*

Plaintiff's motion alleged that the property described in Exhibit A was seized against his will without a search warrant in violation of his Fourth and Fifth Amendments rights under the Constitution of the United States of America. On March 25, 1964, the injunctive order set forth above was executed by the Honorable Fred Kunzel, United States District Judge. The defendants filed an opposition to the motion to suppress and in addition moved the court to dismiss the temporary restraining order.

On April 23, 1964, this matter came on for hearing. T. Kimball Hill, the plaintiff herein, testified in support of his motion and on cross-examination, upon advice of counsel, invoked his Fifth Amendment privilege and refused to testify in response to questions which asked: whether Dr. T. Kimball Hill had told Mr. DeVotie that he had changed the footings on his 1961 patient ledger book when he heard that Mr. DeVotie was coming out to audit his books for that year; whether Dr. T. Kimball Hill had had a conversation with Mr. DeVotie in October of 1963 with relation to dividends that were disclosed at that time whereby Dr. Hill had stated "Well, I knew you would get me sooner or later." or words to that effect; whether the books turned over to Mr. Wordell on January 22, 1964, were prepared by copying from Dr. Hill's original set of books; and finally whether Dr. Hill was warned of his constitutional rights on February 26, 1964. On each instance where the plaintiff refused to answer the questions propounded and invoked his privilege against self-incrimination the court sustained the claim of privilege.

WHEREAS the parties now having been heard and all of the evidence having been received the following are the Findings of Fact . . ..

---

*su* "certiorari should be granted and the judgment below affirmed." Ibid. In other words Mr. Justice Douglas felt

that *Kohatsu* does not come within the ambit of *Miranda*.

## FINDINGS OF FACT

### I

The plaintiff, T. Kimball Hill, is an oral surgeon practicing dentistry in San Diego, California.

### II

Corwin B. DeVotie is and was at all relevant times mentioned herein an Internal Revenue Agent employed by the Internal Revenue Service assigned to the San Diego office. At all relevant times mentioned herein DeVotie was acting and acted within the scope of his duties as an Internal Revenue Agent.

### III

The plaintiff T. Kimball Hill's 1961 income tax return was assigned to DeVotie for audit and examination.

### IV

DeVotie's first contact with Dr. Hill was by telephone on June 12, 1963. At that time DeVotie gave his name, title and employer and advised Dr. Hill that he had his 1961 return for examination and desired some mutually agreeable date for a meeting for the purpose of starting an examination. Dr. Hill was advised by DeVotie of the type of material that DeVotie would like to have available on that day for the purpose of starting the examination.

### V

On June 17th DeVotie went to Dr. Hill's office and introduced himself by title and employer and showed the doctor his credentials. Thereafter the plaintiff T. Kimball Hill produced the records which DeVotie had requested to be made available in their June 12, 1963, telephone conversation.

### VI

DeVotie's examination of Dr. Hill's books was confined only to those books for the year 1961.

### VII

On October 18, 1963, DeVotie and Dr. Hill had a conversation wherein the doctor was asked to explain the fact that on his 1962 return dividend income began to show up in fairly substantial amounts from a variety of sources and from a variety of stockholdings and that the situation did not exist in 1960 or 1961. DeVotie then asked Dr. Hill to explain the sources of funds with which he had acquired these stocks, when he had acquired the stocks and generally about the dividend income and the stocks that produced them. In response to these questions Dr. Hill stated in effect that he had been waiting for this to come and that he was glad it was out in the open. He asked DeVotie if he knew what it was like to have trembling hands since he, DeVotie, had begun investigation.

### VIII

After the October 18, 1963, meeting with Dr. Hill, DeVotie referred the matter to his superiors suggesting the possibility of fraud.

### IX

On January 8, 1964, Edwin H. Wordell was assigned Dr. Hill's case for a preliminary examination and a few days later Wordell discussed the case with DeVotie.

### X

Edwin H. Wordell is a Special Agent with the Intelligence Division of Internal Revenue Service assigned to the San Diego office.

### XI

At all relevant times mentioned herein Wordell acted in his capacity as a Special Agent within the scope of his employment as a Special Agent of the Internal Revenue Service, Intelligence Division.

### XII

Wordell's first meeting with Dr. Hill occurred on January 22, 1964, in Dr. Hill's office at which time he was introduced to Dr. Hill by DeVotie, who stated: "Dr. Hill, I would like you to meet Special Agent Wordell, with the Intelligence Division of the Internal Revenue Service." At which time Wordell displayed his commission for Dr. Hill's inspection. Dr. Hill sort of waved the commission off stating: "That's all right." Wordell ask-

ed Dr. Hill if he would look at his commission, whereupon Dr. Hill nodded and took the commission from Wordell and examined it then returned it to Wordell, who replaced it in his pocket.

## XIII

Wordell then told Dr. Hill that he had been assigned to investigate his 1959 to 1962 returns and was advised by Dr. Hill that he would do everything he could to cooperate. Dr. Hill then gave Wordell some patient record books for the years 1959, 1960 and 1962 and in response to Wordell's request that these books be removed to the Internal Revenue Office for complete examination, Dr. Hill stated: "Certainly. You are not going to have any trouble with me." Wordell then prepared a receipt for the records turned over to him by Dr. Hill and signed the receipt noting his title as Special Agent. DeVotie also signed the receipt and noted his title as Revenue Agent.

## XIV

On February 26, 1964, at Wordell's invitation Dr. Hill came to the Intelligence Division office of Internal Revenue Service in San Diego, California. Dr. Hill brought with him additional books and records for which he received a receipt.

## XV

On February 26, 1964, in the Intelligence Division office of the Internal Revenue Service, San Diego, California, Dr. Hill was warned of his constitutional rights, his right to an attorney and specifically his rights under the Fifth Amendment of the Constitution. He thereafter submitted to a question and answer conference under oath, which was recorded by a stenographer and which was received in evidence at the hearing. Again the doctor was reminded of his constitutional rights.

## XVI

At the question and answer conference on February 26, 1964, Dr. Hill advised that he had additional records which ac-

curately related his income for the years in question.

## XVII

On the following day, Dr. Hill turned over additional books and records to DeVotie and a Mr. Peavey of the Internal Revenue Service as he had promised the day before at the question and answer conference.

## XVIII

On February 28, 1964, Wordell and Dr. Hill had a conversation in which Dr. Hill advised, in response to a question as to why he had two sets of patient record books for the years 1959, 1960 and 1962, that when he was first contacted by Mr. DeVotie in 1963 he was concerned and that he checked his 1961 patient record book in which he recorded his patient receipts and found that the total receipts recorded in that book were not in accordance with his 1961 return. Dr. Hill stated that he adjusted the 1961 patient record book by changing the footings in the book so that when you added the footings only the total amount was in agreement with his 1961 return. Dr. Hill stated that he realized that Mr. DeVotie would probably ask for and examine his 1959, 1960 and 1962 patient record books so he took a desperate chance and he had his wife transcribe a complete new set of 1959, 1960 and 1962 patient record books. Dr. Hill further stated that he went through the original 1959 patient record book and ticked off certain amounts and instructed his wife to reduce these amounts so that when the total receipts were entered in the new set of books they would match and be in agreement with the income shown on the respective returns.

## XIX

On March 3, 1964, Wordell had a conversation with Dr. Hill wherein Dr. Hill explained that some of the patient cards which had been previously turned over to Internal Revenue Service had amounts shown on them which had been systematically excluded from the patient record book. On that date Dr. Hill turned over additional documents.

## XX

On February 26, 1964, Dr. Hill asked Wordell if it would be necessary for him to contact Dr. Hill's patients because he was concerned about that matter because he said this would be detrimental to his practice and that he was also concerned about the fact that it might influence his license to practice in California.

## XXI

At all times mentioned herein Wordell and DeVotie conducted themselves as gentlemen and did not employ any coercion or force to secure any documents, records or disclosures.

## XXII

At all times herein mentioned Dr. T. Kimball Hill the plaintiff herein, knew the identities, job title and capacity of each Corwin B. DeVotie and Edwin H. Wordell.

## XXIII

At all times mentioned herein the plaintiff T. Kimball Hill freely and voluntarily surrendered the books and records which are the subject matter of this proceeding to agents and employees of the Internal Revenue Service with the knowledge that said books and records were to be used for the purpose of determining his true income for the years 1961, and 1959, 1960 and 1962 respectively.

## XXIV

That at no time did officers or agents employees of the Internal Revenue Service misrepresent the facts, practice deceit, stealth or engage in conduct which was improper incident to this investigation.

## XXV

That at all times mentioned herein the plaintiff T. Kimball Hill knew that the investigation would be a full and complete one.

## APPENDIX B

The following constitutes the Findings of Fact and Conclusions of Law of this Court:

## FINDINGS OF FACT

### I

Thomas Kimball Hill (herein referred to as defendant Hill), a resident of San Diego County, State of California, who during the calendar year 1959 was married, did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1959 by filing and causing to be filed with the District Director of Internal Revenue for the Internal Revenue District of Los Angeles at Los Angeles, California, a false and fraudulent joint income tax return on behalf of himself and his said wife wherein it was stated that their taxable income for said calendar year was the sum of $17,015.47 and that the amount of tax due and owing thereon was the sum of $4,247.07, whereas, as he then and there well knew, their joint taxable income for the said calendar year was the sum of $74,668.11 upon which said taxable income there was owing to the United States of America an income tax of $35,164.91.

### II

Defendant Hill, a resident of San Diego County, State of California, who during the calendar year 1960 was married, did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1960 by filing and causing to be filed with the District Director of Internal Revenue for the Internal Revenue District of Los Angeles at Los Angeles, California, a false and fraudulent joint income tax return on behalf of himself and his said wife wherein it was stated that their taxable income for said calendar year was the sum of $19,869.75 and that the amount of tax due and owing thereon was the sum of $5,216.57, whereas, as he then and there well knew their joint taxable income for the said calendar year was the sum of $82,796.56 upon which said taxable income there was owing to the United

States of America an income tax of $40,-644.29.

## III

Defendant Hill, a resident of San Diego County, State of California, who during the calendar year 1961 was married, did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1961 by filing and causing to be filed with the District Director of Internal Revenue for the Internal Revenue District of Los Angeles at Los Angeles, California, a false and fraudulent joint income tax return on behalf of himself and his said wife, wherein it was stated that their taxable income for said calendar year was the sum of $20,448.82 and that the amount of tax due and owing thereon was the sum of $5,426.93, whereas, as he then and there well knew, their joint taxable income for the said calendar year was the sum of $125,148.89 upon which said taxable income there was owing to the United States of America an income tax of $62,758.04.

## IV

Defendant Hill, a resident of San Diego County, State of California, who during the calendar year 1962 was married, did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1962, by filing and causing to be filed with the District Director of Internal Revenue for the Internal Revenue District of Los Angeles at Los Angeles, California, a false and fraudulent joint income tax return on behalf of himself and his said wife wherein it was stated that their taxable income for said calendar year was the sum of $23,368.98, and that the amount of tax due and owing thereon was the sum of $6,484.20, whereas, as he then and there well knew, their joint taxable income for the said calendar year was the sum of $98,211.36 upon which said taxable income there was

owing to the United States of America an income tax of $49,825.24.

## V

Defendant Hill is, and at all times herein mentioned was, an oral surgeon practicing dentistry at 2308 Sixth Avenue in the City of San Diego, State of California.

## VI

Corwin B. DeVotie (herein referred to as Agent DeVotie) is, and at all times herein mentioned was, an Internal Revenue Agent employed by the United States Internal Revenue Service assigned to the San Diego, California, office of said Service.

## VII

At all time herein mentioned Agent DeVotie was acting, and did act, within the scope of his duties as an Internal Revenue Agent of the United States Internal Revenue Service.

## VIII

Edwin H. Wordell (herein referred to as Special Agent Wordell) is, and at all times herein mentioned was, a Special Agent employed by the Intelligence Division of the United States Internal Revenue Service assigned to the San Diego, California, office of said Service.

## IX

At all times herein mentioned Special Agent Wordell was acting, and did act, within the scope of his duties as a Special Agent of the Intelligence Division of the United States Internal Revenue Service.

## X

The Form 1040, United States Individual Income Tax Form, filed jointly by defendant Hill and his wife, Dolores L. Hill, for the year 1961 was assigned to Agent DeVotie for examination to determine whether said return accurately reported said taxpayers' civil tax liability for 1961.

## XI

Agent DeVotie's initial contact with defendant Hill was by telephone on June 12, 1963, at which time Agent DeVotie stated his name and advised defendant Hill that: (1) he was an Internal Revenue Agent employed by the United States Internal Revenue Service; (2) he had been assigned defendant Hill's 1961 federal income tax return for examination; (3) he desired an appointment with defendant Hill at a mutually agreeable time and place to commence the examination. A meeting was agreed upon for June 17, 1966, at defendant Hill's office and Agent DeVotie requested that defendant Hill have available for examination at that time defendant Hill's patient record book, receipt book, patient record cards and cancelled checks for the year 1961.

## XII

On June 17, 1963, Agent DeVotie met defendant Hill at defendant Hill's office at which time Agent DeVotie again introduced himself by name, title and employer and furnished his credentials to defendant Hill for inspection. Defendant Hill thereafter provided for Agent DeVotie's examination the records pertaining to the year 1961 which Agent DeVotie had requested during the telephone conversation of June 12, 1963, referred to in Finding XI.

## XIII

Agent DeVotie returned to the office of defendant Hill on June 20, 1963, for the purpose of completing the examination of said records produced by defendant Hill on June 17, 1963.

## XIV

During the course of said examination Agent DeVotie discovered that numerous daily totals recorded in the 1961 patient record book were incorrect resulting in a net understatement of income for 1961 in the amount of $9,977.65.

## XV

During the summer of 1963 Agent DeVotie was engaged with another assignment and for that reason conducted no further examination with respect to defendant Hill's 1961 federal income tax return other than to obtain from the appropriate District Director of Internal Revenue the form 1040, United States Individual Income Tax Returns, filed jointly by defendant Hill and his wife for the years 1960 and 1962.

## XVI

Agent DeVotie's next contact with defendant Hill was on or about October 7, 1963, when Agent DeVotie contacted defendant Hill by telephone and advised defendant Hill that: (1) he had been assigned defendant Hill's federal income tax returns for the years 1960 and 1962 for examination; (2) he desired an appointment at a mutually agreeable time and place to commence the examination of said returns; (3) and desired defendant Hill to have available for examination his patient record books, receipt books, patient record cards and cancelled checks for 1960 and 1962. A meeting was agreed upon for October 9, 1963, at defendant Hill's office.

## XVII

On October 9, 1963, Agent DeVotie met with defendant Hill at defendant Hill's office, at which time defendant Hill produced for Agent DeVotie's examination the records pertaining to the years 1960 and 1962 which Agent DeVotie had requested during the telephone conversation of October 7, 1963, referred to in Finding XVI.

## XVIII

Agent DeVotie returned to the office of defendant Hill on October 10, 15, 16, 17, 18, 21 and 23, 1963, for the purpose of completing the examination of said records produced by defendant Hill.

## XIX

During the meeting on October 18, 1963, Agent DeVotie requested an explanation from defendant Hill with respect to the fact that defendant Hill's federal income tax return for 1962, unlike his federal income tax returns for 1960 and 1961, reported substantial dividend income from a variety of different securities. Defendant Hill stated, in effect,

that he had been waiting for this to come, he was glad it was out in the open, he had had trembling hands since Agent DeVotie had begun the examination, he had unreported dividend income during the years 1960 and 1961, and that he knew such dividend income should have been reported on his federal income tax returns for those years.

## XX

Following the conversation referred to in Finding XIX and during the examination referred to in Finding XVIII, defendant Hill produced for Agent DeVotie's inspection, and delivered into Agent DeVotie's custody, brokerage statements pertaining to some of the brokerage accounts maintained by defendant Hill during and prior to the years in question.

## XXI

Agent DeVotie completed his analysis of said brokerage statements in November of 1963 prior to November 19, 1963.

## XXII

Following completion of said analysis referred to in Finding XXI, Agent DeVotie transmitted a referral report to his supervisor on November 19, 1963, suggesting the possibility of fraud by defendant Hill based upon defendant Hill's apparent understatement of tax liability and defendant Hill's apparent intent to evade taxes by knowingly failing to report dividend income.

## XXIII

On or about November 29, 1963, Agent DeVotie returned said brokerage statements to defendant Hill but no aspect of Agent DeVotie's examination of defendant Hill's federal income tax returns was discussed at that time.

## XXIV

On January 8, 1964, Special Agent Wordell was assigned to conduct a preliminary investigation regarding possible fraudulent income tax evasion by defendant Hill. The purpose of said preliminary investigation was to determine whether or not a complete investigation was warranted.

## XXV

Several days subsequent to January 8, 1964, Agent DeVotie and Special Agent Wordell discussed for the first time Agent DeVotie's examination of defendant Hill's federal income tax returns.

## XXVI

Prior to the meeting with Special Agent Wordell, referred to in Finding XXV, Agent DeVotie had at no time communicated in any manner with any special agent or any other person associated with the Intelligence Division of the United States Internal Revenue Service regarding his examination of defendant Hill's federal income tax returns.

## XXVII

On or about January 21, 1964, Agent DeVotie arranged a meeting with defendant Hill at defendant Hill's office for January 22, 1964, and advised defendant Hill that Special Agent Wordell would also attend the meeting.

## XXVIII

On January 22, 1964, Special Agent Wordell was introduced to defendant Hill at the latter's office by Agent DeVotie who identified Wordell as a special agent of the Intelligence Division of the Internal Revenue Service, at which time Special Agent Wordell handed his credentials to defendant Hill who examined said credentials and returned them to Special Agent Wordell.

## XXIX

At said meeting on January 22, 1964, Special Agent Wordell then informed defendant Hill that he had been assigned to investigate defendant Hill's 1959, 1960, 1961 and 1962 federal income tax returns to which defendant Hill replied, in effect, that he would do everything he could to cooperate. Defendant Hill then produced for Special Agent Wordell patient record books for the years 1959, 1960 and 1962 and, in response to Special Agent Wordell's request for permission to remove said books to the Internal Revenue Office

for complete examination, defendant Hill stated: "Certainly. You are not going to have any trouble with me." Special Agent Wordell then prepared and delivered to defendant Hill a written receipt for said books which he and Agent DeVotie signed, noting their respective titles.

### XXX

On February 26, 1964, in response to Special Agent Wordell's request by telephone on February 25, 1964, defendant Hill came to the office of the Internal Revenue Service in San Diego bringing with him books and records requested by Special Agent Wordell. Upon defendant Hill's arrival, Special Agent Wordell advised him he was not required to furnish any information, nor was he required to furnish any records and that anything he did furnish could be used against him in any proceeding initiated by the government. Following said warning, defendant Hill stated that he understood and then produced said books and records and placed them in the custody of Special Agent Wordell. Thereafter, defendant Hill consented to a question and answer conference attended by Special Agent Wordell, Agent DeVotie, defendant Hill and a stenographer who recorded the statements made by each of the persons present. At the outset of the said conference, Special Agent Wordell again advised defendant Hill of his constitutional rights to remain silent, to have an attorney present and further advised defendant Hill that anything said by him or documents produced by him might be used against him in any proceeding initiated against him by the government.

### XXXI

During the question and answer conference referred to in Finding XXX, defendant Hill admitted he also had systematically failed to record a portion of his professional income in his patient record books for the years in question. Instead, he had recorded such income upon patient record cards which he had segregated from the patient record cards maintained by his employees in the regular course of his dentistry practice. Said segregated cards had not theretofore been furnished for inspection to either Agent DeVotie or Special Agent Wordell.

### XXXII

Subsequent to said question and answer conference referred to in Finding XXX, defendant Hill on the following dates delivered books and records relating to his financial affairs for the years in question into the possession of Special Agent Wordell or Agent DeVotie, or both, for the purpose of enabling said agents to inspect said books and records: February 27, February 28, March 3, March 9 and March 10, 1964.

### XXXIII

On February 28, 1964, subsequent to the question and answer conference referred to in Finding XXX, Special Agent Wordell and defendant Hill had a conference in which Special Agent Wordell requested an explanation with respect to the fact that defendant Hill had two sets of patient record books for the years 1959, 1960 and 1962. Defendant Hill replied that, when he was first contacted by Agent DeVotie in 1963, he was concerned and, upon checking his 1961 patient record book in which he recorded his professional income for that year, he found that the total receipts recorded in said book were not in accordance with his 1961 federal income tax return. Defendant Hill stated he then adjusted the 1961 patient record book by changing the daily totals in said book so that the sum of said daily totals was in agreement with his 1961 federal income tax return. Defendant Hill further stated that he realized Agent DeVotie would probably ask for and examine his 1959, 1960 and 1962 patient record books so he took a "desperate chance" and had his wife transcribe a complete new set of 1959, 1960 and 1962 patient record books. Defendant Hill further stated that he went through the original patient record books for said years and designated certain amounts which he instructed his wife to reduce or eliminate in preparing the new set of books for said years with the result

that the total receipts entered in the new set of books would agree with the amount of income reported on defendant Hill's federal income tax returns for said years.

### XXXIV

Defendant Hill is an educated and intelligent person who at the times in question had been practicing dentistry for approximately nineteen years in San Diego, California.

### XXXV

At all times herein mentioned, Special Agent Wordell and Agent DeVotie, and each of them, conducted themselves as gentlemen and did not employ any coercion or force to secure any documents, records, disclosures or statements from defendant Hill.

### XXXVI

At all times herein mentioned, defendant Hill knew the identity, job title and capacity of Agent DeVotie and Special Agent Wordell, and each of them.

### XXXVII

At all times herein mentioned, defendant Hill freely and voluntarily surrendered the books and records produced by him for inspection by Agent DeVotie and Special Agent Wordell, and each of them, with the knowledge that said books and records were to be used for the purpose of determining his true income for the years 1959, 1960, 1961 and 1962, respectively.

### XXXVIII

At all times herein mentioned, defendant Hill freely and voluntarily made the disclosures, admissions and other statements made by him to Agent DeVotie and Special Agent Wordell, and each of them, with the knowledge that said agents were conducting an examination and investigation for the purpose of determining his true income for the years 1959, 1960, 1961 and 1962, respectively.

### XXXIX

At no time herein mentioned did Agent DeVotie or Special Agent Wordell, or any other officer, agent or employee of the United States Internal Revenue Service misrepresent any facts, practice any deceit, practice any fraud or engage in conduct which was improper incident to the investigation of defendant Hill's federal income tax returns.

### XL

At all times herein mentioned, defendant Hill was fully aware of all the consequences which might result from turning over his books and records to the Internal Revenue agents.

### XLI

At no time herein mentioned did Agent DeVotie, Special Agent Wordell or any other agent or employee of the United States of America (1) detain defendant Hill; (2) take defendant Hill into custody; or (3) deprive defendant Hill, in any manner, of his freedom of action or movement.

### CONCLUSIONS OF LAW

### I

At no time herein mentioned was Agent DeVotie or Special Agent Wordell under any duty to advise defendant that (1) he had a right to remain silent; (2) any statement made by him or any information furnished by him, whether in the form of business records or otherwise, could be used as evidence against him; (3) he had the right to consult an attorney; or (4) he had the right to the presence of an appointed or retained attorney.

### II

At no time herein mentioned did Agent DeVotie, Special Agent Wordell, or any other officer, employee or agent of the United States of America violate, abridge or interfere with the exercise of defendant Hill's rights under the fourth amendment to the Constitution of the United States of America.

### III

At no time herein mentioned did Agent DeVotie, Special Agent Wordell, or any other officer, employee or agent of the

152

United States of America violate, abridge, or interfere with the exercise of defendant Hill's rights under the fifth amendment to the Constitution of the United States of America.

## IV

At no time herein mentioned did Agent DeVotie, Special Agent Wordell, or any other officer, employee or agent of the United States of America violate, abridge or interfere with the exercise of defendant Hill's rights under the sixth amendment to the Constitution of the United States of America.