458 F.2d 759
 147 U.S.App.D.C. 340
 UNITED STATES of America
v.
R. Marbury STAMP, Appellant.
UNITED STATES of America
v.
Harlan E. FREEMAN, Appellant.
UNITED STATES of America
v.
E. Neil ROGERS, Appellant.
UNITED STATES of America
v.
Walter R. REYNOLDS, Appellant.
 Nos. 24193, 24194, 24197, 24198.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 2, 1971.
Decided Dec. 20, 1971.
Petitions for Rehearing Denied Feb. 22, 1972.
Certiorari Denied June 7, 1972.
See 92 S.Ct. 2424.
 
 Mr. Stanley M. Dietz, Rockville, Md., for appellant in No. 24,193.
 Mr. Lester M. Bridgeman, Washington, D. C. (appointed by this court) for appellant in No. 24,194.
 Mr. Farley M. Warner, Washington, D. C. (appointed by this court) for appellant in No. 24,197.
 Mr. J. Alan Galbraith, Brattleboro, Vt., with whom Messrs. Vincent J. Fuller, and Robert L. Weinberg, Washington, D. C., were on the brief, for appellant in No. 24,198.
 Mr. Paul J. Schaeffer, Atty., Department of Justice, of the bar of the Supreme Court of Oregon, pro hac vice, by special leave of Court, with whom Mr. William S. Lynch, Atty., Department of Justice, was on the brief, for appellee.
 Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., also entered appearances for appellee in Nos. 24,193, 24,194 and 24,198.
 Before BAZELON, Chief Judge, and TAMM and ROBB, Circuit Judges.
 TAMM, Circuit Judge:
 
 
 1
 In this case the six defendants, Walter R. Reynolds, Bertram G. Dienelt, Jr., Harlan E. Freeman, R. Marbury Stamp, A. Claiborne Leigh and E. Neil Rogers, were tried by a jury on a 13-count indictment in the United States District Court for the District of Columbia. With the single exception of Dienelt they were all found guilty on each of the 13 counts of the indictment. The first count charged that, in violation of 18 U.S.C. Sec. 371 (1964), the appellants and two other defendants[1] conspired to violate D.C.Code Sec. 22-1301 (1967) (false pretenses) and D.C.Code Sec. 22-1401 (1967) (forgery) in connection with the refinancing of loans that had been extended by Eastern Savings and Loan Association of Washington, D. C. (hereinafter either "Eastern" or "the Association"), on 17 parcels of land. Counts 2-13 of the indictment charged each of the defendants, with the exception of Dienelt, with substantive violations of D.C.Code Sec. 22-1301 (1967) in the refinancing of 12 separate parcels. The appellants have raised a number of claims of error, either individually or which have been joined in by other appellants. While we do not find it necessary to discuss each of the claims raised by the appellants, we have given each of them careful consideration. Nonetheless, this court is compelled because of the reasons outlined below to affirm each of the convictions of the District Court.
 
 I. Statement of Facts
 
 2
 The issues in this case are highly complicated and therefore an in-depth analysis of the events leading up to the indictment will be required in order to understand the contentions of the appellants and those of the Government.
 
 
 3
 Sometime prior to 1963 a special project was formed by the Internal Revenue Service for the purpose of investigating corruption among certain public officials in Fairfax County, Virginia. The project was formed jointly by the United States Department of Justice and the Internal Revenue Service, and was staffed by Revenue and Special Agents of the Internal Revenue Service.[2] Legal assistance to this group, known as "Metro" Project, was provided by the Organized Crime and Racketeering Section of the Department of Justice.
 
 
 4
 The purpose of this investigation was explained by Edward Joyce, an attorney with the Organized Crime and Racketeering Section of the Criminal Division, Department of Justice, who served as legal advisor to the project. Joyce stated that
 
 
 5
 [T]he investigation was an income tax investigation into various activities in Fairfax County, that is, to ascertain whether the people who were accepting bribes were paying income taxes on the bribes accepted and whether the people who were paying the bribes were properly charging them or not charging, rather, as an expense, and the gambling was conducted under Wager Tax Stamp Act. [Sic.]
 
 
 6
 (J.A. 53.)
 
 
 7
 The central purpose of the organization was to look at the income tax investigations of the people in Fairfax County. The decision to proceed on Section 1952 was not made until there was an assessment of all of the evidence obtained.[3]
 
 
 8
 (J.A. 56.)
 
 
 9
 A full description of "Metro's" modus operandi was given by Special Agent Kenneth E. McElroy, who at the time of the investigation was assigned to the Internal Revenue Service's Intelligence Division in Richmond, Virginia:
 
 
 10
 The practice was that a revenue agent was assigned in a case to make an audit, and at the completion of his audit or at the time that he figured he had gone far enough, if he found what were indications of fraud-and we say indications of fraud is all he is required to find-upon finding this, he writes what is known as a Referral Report. This Referral Report is sent to the Chief of the Intelligence Division in Richmond, Virginia, and he has to make the decision as to whether there will be what is spoken of as a joint investigation. And if so, then a special agent is assigned, and the special agent assigned and the revenue agent, in most cases the same revenue agent, continues on with the investigation.
 
 
 11
 (J.A. 48.)
 
 
 12
 "Metro" Project was placed under the supervision of Oral Cole, who was named project director. One of the prime targets of their investigation was A. Claiborne Leigh, who was, at the time, chairman of the Fairfax County Board of Supervisors. In June 1963 Cole, acting on a tip received from an informer, instructed Revenue Agent Hansell to audit Leigh's income tax returns for the year 1960. Leigh gave Hansell permission to inspect his records and to copy certain cancelled checks, bank statements and deposits. At this time Hansell did not make Leigh aware of his concern with potential criminal activity on Leigh's part. However, on January 20, 1964, Hansell returned to Leigh's office with Special Agent Kenneth E. McElroy, at which time Leigh was notified that he was under suspicion for criminal tax evasion and he was then given the required warnings with regard to his constitutional rights.
 
 
 13
 Prior to June 1963 Leigh was engaged in the practice of law with appellant Rogers. When Hansell visited Leigh's office he learned that some of the records of this partnership were in Rogers' possession. Interested in examining these records, Special Agent McElroy visited appellant Rogers in February 1964 and told him that he desired to examine certain records of the Leigh-Rogers partnership in connection with a criminal investigation of Leigh in which he was then engaged. McElroy assured Rogers that he was not under investigation, and after these assurances McElroy received several documents in the form of settlement files from Rogers. Several months later, in October and November 1964, McElroy again interviewed Rogers; this time with reference to the "straw" transactions which are at issue in this case. Finally, in April 1965, Rogers himself was subjected to an audit by a revenue agent. At no time was Rogers told that he was a criminal suspect nor was he advised of his constitutional rights.[4]
 
 
 14
 In another aspect of the "Metro" Project operation, Director Cole instructed Michael J. Evangelist, a revenue agent, to audit certain tax returns of the Reynolds' Construction Company, of which appellant Reynolds was the president. In addition, Agent Evangelist was assigned to audit personal returns of both Reynolds and his wife. During the course of these audits, Evangelist was "to obtain all the financial transactions between Reynolds and Leigh." (J.A. 41.) McElroy made this request based on his suspicion that Reynolds had bribed Leigh. In March 1964 Evangelist visited the company's offices and was given permission to inspect all corporate records by George R. Steele, secretary-treasurer of the company and an accountant. Evangelist did not tell Steele of the criminal aspect of his investigation.
 
 
 15
 To fully understand the facts in this complicated case, it will be helpful to explain the Government's theory of the litigation. Reynolds Construction Company had borrowed heavily from Eastern over the years in order to finance a housing project in McLean, Virginia. Soon after this project was completed Reynolds desired additional loans from Eastern. Reynolds understood from Eastern, however, that additional loans could not be granted until the company could sell a number of the homes which were encumbered by the construction loans. Reynolds, unsuccessful in his efforts to sell the homes to legitimate purchasers, devised a scheme to sell these homes to "straw" purchasers, who would in turn borrow money from Eastern under the guise of loans enabling purchase of the improved lots from Reynolds. This would, therefore, change the nature of the loan from one issued to Reynolds for construction purposes to one issued to the ultimate purchaser as a mortgagetype transaction. The money realized from the loans to "straw" purchasers would be used to liquidate the construction loans with the balance finding its way to Reynolds, who by this time would arrange for a re-transfer of the property from the "straw" purchaser. According to the Government, Reynolds was aided in his ruse by the other three appellants and the two defendants not involved in this appeal.
 
 
 16
 Appellant Stamp, a mortgage broker, was responsible for submitting various loan applications to Eastern; none of the "straws" made personal application to the bank for any of the loans. Appellant Freeman, secretary of Reynolds Construction, and defendant Dienelt, Reynolds' outside accountant, were instructed by Reynolds to obtain the "straw" purchasers. Only being able to find five willing parties between them, Freeman resorted to picking 12 names at random from the 1960 Harvard Alumni Directory. These 12 parties had no knowledge of their selection and were never informed of their being listed as purchasers in any of the documents for the loans. Freeman also fabricated false credit statements for these 12 parties. Even the credit information supplied for the five bona-fide "straw" parties contained statements which grossly overstated the "straws"' true assets.
 
 
 17
 Eastern would only disburse loans in accordance with their established settlement procedures. These procedures called for the completion and execution of seven documents, i. e., a sales contract, a formal loan application, the lender's credit statement, a settlement statement, a deed of trust, a deed of trust note and an application for membership in Eastern Building and Loan Association (also known as a signature card). Under their established policy Eastern would perfect a loan by giving the loan application to an appraiser for approval, upon receiving the appraiser's report the application would be referred to the loan committee, which was composed of two or three senior Association officers, who would in turn make recommendations to the executive committee. It was the executive committee, i. e., the president and four members of the board of directors, who actually passed on loan applications and committed funds. Once this decision has been made the loan applicant is informed of Eastern's decision. The applicant is then responsible for having a title search performed and obtaining a title binder[5] which is then returned to Eastern. The title binder is sent to Eastern by the settlement attorney. The Association then would set a date for settlement and begin preparation of certain of the documents which we enumerated above, i. e., deed of trust, deed of trust note and the signature card, as well as, at the time of the instant transactions, a passbook with a payment notice thereon. All of these matters were handled by the settlement attorney who received the forms from Eastern and was instructed to give them to his clients at the time of settlement. During the meeting in the settling attorney's office the settlement sheet which contains all the information concerning the loan disbursement, the sales price and all other figures involved in the transaction is reviewed and a copy returned to the Association. Receipt of the settlement sheet along with the executed note and other papers completes the process and Eastern would then disburse the money. (J.A. 82-85, direct examination by the Government of Mr. Robert L. Stoy, who was assistant treasurer of Eastern when the loans in question were issued.) Defendant Leigh and appellant Rogers, who were partners, were brought into the scheme when they undertook to act as settlement attorneys.
 
 
 18
 According to the Government's theory Eastern believed the contents of the various documents presented to it to be accurate and truthful, and in fact, on their face, the documents appeared not to be "straw" transactions but actual purchases, wherefore in 1962 and 1963 Eastern approved loans totaling $607,000 and sent the necessary papers to complete the transactions to Leigh and Rogers as settlement attorneys as was their practice. Each of the appellants received a fee for his role in the overall plan. While none of the purported purchasers received any of the loan proceeds, the five bonafide "straw" purchasers were given a fee of $200 for agreeing to act in that capacity.
 
 
 19
 On the basis of information obtained in these early Metro investigations, Revenue Agent Evangelist was instructed to interview appellant Freeman on five or six occasions in the spring and summer of 1964. At some point during these interviews Freeman indicated to Evangelist that he had indeed forged the name of the borrower on 12 of the 17 "straw" transactions and that he had been paid a $200 fee for each such transaction. The record, however, is not clear as to whether Evangelist was cognizant of the Freeman forgeries when they initially met. Once again, there was no mention of the criminal aspect of the investigation made to the appellant.
 
 
 20
 September 1965 found the members of the "Metro" Project sending letters of inquiry to persons whose names appeared on the records involving the transactions investigated. In December of the same year project members received responses indicating that the "borrowers" had not participated in the transactions under investigation and that they were without knowledge as to what had transpired. When they were next contacted by agents assigned to the Project both Rogers and Freeman were notified of their constitutional rights and informed of their status as criminal suspects. Reynolds was not subsequently contacted and hence was never apprised of his rights.
 
 II. The Indictment
 
 21
 A number of appellants urge us to find the grand jury's indictment faulty since no member of that body read the document in its entirety. The evidence seems to support their contention concerning the reading of the indictment but thorough consideration of all of the surrounding circumstances leads us to believe that this flaw was by no means crucial and certainly was not prejudicial to them.
 
 
 22
 Prior to the trial of this action in the District Court the appellants moved to dismiss the indictment on the grounds that witnesses called before the grand jury were forced to take an oath of secrecy prior to their giving testimony in violation of Rule 6(e), Fed.R.Crim.P. The motion was argued and denied; the appellants have not attacked this ruling on appeal. When the appellants brought a motion to dismiss the indictment, alleging failure of any member of the grand jury to read the indictment, the trial judge ruled the motion to be untimely and, further, he deemed this contention to be waived due to the defendants' failure to bring the matter to the court's attention at the time the earlier motion was made. The trial judge ruled that failure to bring both motions contemporaneously with regard to the indictment constituted a waiver under Rule 12(b) (2), Fed.R.Crim.P.[6] The appellants contend that this matter goes to the jurisdiction of the court and can be raised at any time during the pendency of the proceeding. Id.
 
 
 
 * * *
 
 
 
 23
 * * *
 
 
 24
 The indictment in this case was 21 pages long and contained 13 separate counts. The first count is nine pages long and charges conspiracy, while each remaining count concerns a single loan transaction and is one page in length. Counts 3 through 13 are identical to Count 2 except that each involves a different date and different loan amount. A hearing was held on April 28, 1969 to consider the merits of appellants' challenge to the indictment. Mr. Evan L. Swain, the foreman of the grand jury, was called upon to testify and stated in open court that on the date the indictment was returned the Government attorney read the first count to the grand jury in its entirety, as did he the second count, and that he then proceeded to summarize the remaining counts to the grand jury explaining that the language in each of these counts was the same as that in count 2 and that the only difference in each of these counts was the date and the amount of the given loan in question. The Government attorney then left the indictment, which he had previously prepared, with the grand jury giving them the opportunity to deliberate and determine whether or not to return an indictment. The grand jury deliberated and chose to return the indictment, at which time the foreman affixed his signature to the indictment; it was returned in open court at 10:15 a. m.
 
 
 25
 Finding that the grand jury was no longer in session when he arrived at 10:18 a. m., attorney for appellant Reynolds brought a motion to dismiss the indictment since he deemed it impossible for the grand jury to meet at 10:00 a. m., the time he believed that the grand jury was scheduled to convene, consider the evidence, read the indictment and pertinent statutes, determine whether or not to indict and return the indictment enabling them to adjourn by 10:18 a. m. The record contains substantial controversy concerning the actual time the grand jury did convene and the Government offered to prove that the actual time of convening was 9:15 a. m. rather than 10:00 as alleged by Reynolds' attorney. The court, however, never called upon the Government to offer its proof.
 
 
 26
 At the pre-trial hearing held on May 5, 1969, the Government attorney testified as follows:
 
 
 27
 [T]he Government read through at the grand jury session prior to the return of the indictment the entire Counts 1 and 2. As was said by Mr. Molenof [co-counsel for the Government] and as testified to by the grand jury foreman, Mr. Swain, the remaining counts were reviewed thoroughly in detail count by count.
 
 
 28
 Now, the second count is basically the same as the remaining counts with different names. There was relation to that and independent review of each count, so the indictment in its entirety was thoroughly reviewed to the grand jury. (Emphasis added.)(J.A. 73). After considering the language of Rule 12, Fed.R.Crim.P., the trial judge ruled on the motion. We set out his comments in the margin.[7]
 
 
 29
 The purpose of the indictment was definitively described by the Supreme Court almost a hundred years ago. Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). In that case the Court stated:
 
 
 30
 We are thus not left to the requirements of the common law, in regard to the necessity of a grand jury or a trial jury, but there is the positive and restrictive language of the great fundamental instrument by which the national government is organized, that 'no person shall be held to answer' for such a crime, 'unless on a presentment or indictment of a grand jury.'
 
 
 31
 Id. at 6, 7 S.Ct. at 784. The Court went on to state that any amendment to the indictment by the trial judge in the form of an addition or deletion in material language of the document would be violative of the intention of the framers. The indictment must be found by the grand jury and cannot be interfered with by the judge. Ex parte Bain, supra, 121 U.S. at 8, 7 S.Ct. 781; see Russell v. United States, 369 U.S. 749, 792-793, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (Harlan J., dissenting); Stirone v. United States, 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); United States v. Norris, 281 U.S. 619, 622, 50 S.Ct. 424, 74 L.Ed. 1076 (1930); Carney v. United States, 163 F.2d 784, 788 (9th Cir. 1947). Although Bain was handed down in 1886 it has continually been followed and cited with approval. In a case where the error is merely a minor procedural matter the court's jurisdiction will not be disturbed. See Frisbie v. United States, 157 U.S. 160, 15 S.Ct. 586, 39 L.Ed. 657 (1895).
 
 
 32
 The leading case in our jurisdiction with regard to the validity of grand jury procedures, as well as the indictment, is Gaither v. United States, 134 U.S.App.D.C. 154, 413 F.2d 1061 (1969). In Gaither the court held that under the requirements of Rule 6, Fed.R.Crim.P., the actual terms of the indictment must be passed on by the grand jury. 134 U.S.App.D.C. at 164, 413 F.2d at 1071. We applied the teachings in Bain concerning amendments by judge or prosecutor after issuance of the indictment by the grand jury and established a set of guidelines for indictment procedures after our decision in Gaither. It should be noted that for the sake of efficient administration of criminal justice we determined that our decision in Gaither should be applied prospectively and not retroactively. 134 U.S.App.D.C. at 166, 177-178, 413 F.2d at 1073, 1084-1085. We need not concern ourselves, however, with the requirements established by Gaither since the indictment in the case at bar was issued before our Gaither decision.
 
 
 33
 In the subsequent cases handed down by this court we have reaffirmed our holding in Gaither. In United States v. Wilson, 140 U.S.App.D.C. 220, 434 F.2d 494 (1970) we deemed it proper to apply Gaither prospectively since the defects it sought to correct were procedural in nature rather than substantive. In United States v. Green, 139 U.S.App.D.C. 75, 77 n. 2, 429 F.2d 754, 756 n. 2 (1970), we held that even if the procedures followed in the indictment issuance were erroneous we would not have to question the validity of the indictment as long as the rights of the appellant do not appear to have been substantially prejudiced.
 
 
 34
 While the appellants contend that the reading of the indictment by the Government attorney and not by any member of the grand jury is a far greater abuse than that in Gaither we find it impossible to concur with their reasoning. This matter was before the grand jury on four occasions prior to the voting on the indictment.[8] The grand jury had ample time in the months this matter was under their consideration to weigh the evidence and the testimony. Once the Government attorney read counts 1 and 2 and explained counts 3 through 13 to the grand jurors they were free to return an indictment or not as their judgment dictated. The mere fact that the foreman, or any other member of the grand jury, failed to physically read the indictment prepared after it had been read to them can in no way, according to our thinking, be found to be prejudicial to appellants herein. We find the motion to be without merit in light of the established decisional law in this Circuit.
 
 III. Delay in Issuance of the Indictment
 
 35
 Appellants claim that the amount of time which elapsed between the dates of the offenses charged and the issuance of the indictment was prejudicial. In his findings the trial judge stated that there was neither unnecessary delay nor substantial prejudice. It is clear to this court that the findings of the trial judge are amply supported by the record.
 
 
 36
 As we have expressed earlier, this case is a highly complex one. There were six defendants at the trial level in an action involving 17 separate transactions transpiring over a period of 16 months. A case of this magnitude by its very nature requires sufficient time to investigate and examine prior to the seeking of an indictment. The record discloses that "Metro" Project was formed early in 1963, however, it was not until December 1965 that the investigators first became aware of the actual events regarding the "straw" transactions. At that time investigators first learned that the names appearing on the loan applications filed by appellants were used without the knowledge or permission of the "purported" loan applicants. "Metro" Project investigators finished interviewing putative borrowers and receiving affidavits from these unsuspecting parties in March 1966. By the time the evaluation of all the material received had been completed it was no longer possible to go before the grand jury then in session. All of its time had been allocated to other matters. When the new grand jury convened in March 1967 the Government brought this case before the grand jurors within a month. The facts support the Government's contention that "[t]here was no plan to delay in bringing it before the grand jury and there was no unnecessary delay in seeking the indictment." Brief for the Government at 25.
 
 
 37
 When there is a showing of substantial delay in a case the Government must show that such delay did not act to substantially prejudice the defendants. A delay is deemed substantial when its length is of greater duration than usually attributable to the normal processes of the judicial system. Williams v. United States, 102 U.S.App.D.C. 51, 250 F.2d 19 (1957), wherein we quote from the Supreme Court decision in Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1905):
 
 
 38
 The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.
 
 
 39
 Williams involved a 7-year delay in prosecution, during which time appellant was adjudicated incompetent and was committed to St. Elizabeths Hospital for mental treatment. In establishing guidelines for trying an appellant seven years after the crime, the court stated:
 
 
 40
 [T]he government must show two things, in [our] view: (1) that there was no more delay than is reasonably attributable to the ordinary processes of justice, and (2) that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay.
 
 
 41
 Williams v. United States, supra, 120 U.S.App.D.C. at 53, 250 F.2d at 21.
 
 
 42
 While the appellants herein base their appeal on the delay between the offenses charged and the issuance of the indictment rather than on a denial of a speedy trial the considerations which this court must make are essentially the same. As the District Court said in United States v. Parrott, 248 F.Supp. 196, 202 (D.D.C.1965):
 
 
 43
 There are four factors in a speedy trial consideration which appear to be crucial: (1) time involved; (2) who caused the delay; (3) the purposeful aspect of the delay; and (4) prejudice to the defendant.
 
 
 44
 The Sixth Amendment right to swift justice is not confined to trial. "[T]he constitutional guarantee protects against undue delays in presenting a formal charge as well as delays between indictment and trial." Mann v. United States, 113 U.S.App.D.C. 27, 29 n. 4, 304 F.2d 394, 396 n. 4 (1962).
 
 
 45
 In Parrott the court expressed the belief that "logically . . . the computation [of occurrence to trial] should begin with the date on which the Government considered the defendants' action to be 'criminal'." Parrott v. United States, supra, 248 F.Supp. at 202. Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363 (1965) involved a conviction in a highly-complex case four years after the issuance of the indictment.
 
 
 46
 Rule 48(b), Fed.R.Crim.P., if not the Sixth Amendment, in terms requires the prosecutor to proceed without "unnecessary delay." The prosecutor's responsibilities under these provisions begin, not when the indictment is returned, but when the prosecution is begun. * * * [T]he critical question in this case is, not when was the indictment filed, but when was the prosecution commenced. (Citations and footnotes omitted.)
 
 
 47
 121 U.S.App.D.C. at 137, 348 F.2d at 366. While the record indicates that Revenue Agent Evangelist learned about the forgeries from Freeman at a relatively early date, it is not clear that these matters were immediately brought to the attention of his superiors. The judge in the District Court held that his superiors did not learn of the forgeries until later and we have no reason to upset his determination. In addition, where a case is as complex as the matter before us, the Government will be allowed more time in bringing an indictment than in a case which contains only simple issues. United States v. Orsinger, 138 U.S.App.D.C. 403, 428 F.2d 1105 (1970), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 61 (1970); Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808 (1963).
 
 
 48
 We find no prejudice by the time lapse in this case. Appellant Stamp does claim to have destroyed some files which would have been the basis of his defense prior to the bringing of the indictment but it is unclear to us as to what aid those files would have been to him and he makes no assertion as to their content or the exonerating effect they would have had with respect to his defense.
 
 
 49
 IV. Eastern's Reliance on Appellant's Representations
 
 
 50
 The appellants contend that the Government has failed to adequately show the presence of all elements necessary for a conviction of obtaining something of value by false pretenses. See Ciullo v. United States, 117 U.S.App.D.C. 31, 325 F.2d 227 (1963). The appellants would concede, as indeed they must, that the Government introduced sufficient evidence related to the proving of some of the necessary elements. It was certainly proven that known false representations were made and that something of value was received. The appellants, however, strongly argue that the Government failed to show one of the other necessary elements to this crime, i. e., reliance by Eastern upon the truthfulness of the documents submitted to them. It is appellants' contention that Eastern actually suggested the scheme involved, since it was willing to make loans to Reynolds Construction Company, but only after "Mr. Reynolds got some 15 or 20 houses out of the name of Reynolds Construction Corporation." (Trial tr. 682.) It is appellants' claim then that "with the knowledge and with the concurrence of Eastern Savings and Loan, [they] were to straw these houses out." (Trial tr. 684.) If this were true, then the necessary fraudulent intent would indeed be lacking.
 
 
 51
 As its first witness on the reliance issue the Government called to the stand Robert L. Stoy, who at the time of the trial was assistant secretary at Eastern, and at the time of the loans was assistant treasurer. Mr. Stoy on direct examination testified as to the general practice of Eastern concerning the procedure followed in 1962 and 1963 after an application for a loan was filed and after favorable consideration (Trial tr. 120). On cross-examination he testified that Eastern's policy with respect to loans to the Reynolds Construction Company was no different than that with any other borrower. (Trial tr. 144.) Though Stoy protested he was not on the loan committee and that he could not testify as to the exact basis for the granting of loans, he did venture to say that loans were based solely on the appraised value of the property. (Trial tr. 133-134.) He did say, however, that credit information was required to be given in the application for a loan and that he did approve the credit of the straw purchasers involved although he did not check the information. (Trial tr. 131, 132.) On re-direct examination Stoy explicitly stated that no loan application would be considered initially if it was found to be predicated on a false sale or information contained therein. (Trial tr. 146.) He also testified immediately thereafter that Eastern at this time, in making permanent loans after construction loans, had no personal contact with the borrowers and acted solely on the papers submitted to it. Id. On re-cross-examination Stoy stated that he never knew of Eastern's permitting property, on which it had a loan to stand in the name of someone other than the real party in interest. (Trial tr. 147.) The Government also called Thomas R. Harrison, who at the time of the trial was president of Eastern and at the time of the loan was executive vice-president, and as such was responsible for the loan department. (Trial tr. 541.) Mr. Harrison also testified that Eastern would not consider making any loans based on a false sale of property or on false information. Harrison further testified on cross-examination that in making a loan, though Eastern primarily looked to the appraised value of the real estate involved, it did require a credit report which was kept on file as a matter of information even though it was never verified. (Trial tr. 558, 559.) Harrison did, however, testify earlier on cross-examination that Eastern would possibly make more of an effort to assure that a loan application was not based on false information (presumably information other than that contained in the credit report), when the application was submitted by an agent it did not know.[9] (Trial tr. 554.)
 
 
 52
 An analysis of the above-mentioned testimony indicates there was sufficient evidence for the jury to infer that Eastern relied on the veracity of the documents presented to it in this case. Stoy stated that Eastern never made loans based on false sales or information and that it never treated loans to Reynolds Construction Company any differently. Stoy never knew of Eastern's permitting a loan on property which stood in the name of someone other that the real party in interest. The fact that Stoy did not specifically check the truthfulness of the credit reports or other documents relating to the loans does not indicate that Stoy did not rely on the veracity of the documents and the representation that a real sale was involved. Perhaps Eastern should make a more thorough check of credit reports and scrutinize minutely the purchase of a home to convince itself that the purchase indeed is real, but this more suspicious approach would certainly do nothing to enhance a bank's good will, nor would it help accelerate the already long and tedious process of purchasing a home. We cannot see then how a lack of inquisitiveness or an abundance of gullibility can negate a showing of reliance. If anything, the testimony showing that Eastern did not conduct an independent investigation of credit information, transactional information, and the documents relating thereto, seems to us to demonstrate Eastern's complete reliance upon the representations made to them by Reynolds, Stamp and their colleagues. In this day of business suspicion and perhaps over-cautious financial dealings it is rare to find a financial institution which follows the methods employed by Eastern; however, this is not indicative of lack of reliance by the Association. It points, rather, to the trust and good faith Eastern exercised in dealings with those with whom they had previous financial transactions. Perhaps the approach which Eastern chose to follow would lead them down a path of thorns subjecting them to the wiles and deceits of those with high business acumen and make them unsuspecting prey for those with less regard for moral business dealings and decent business ethics. All of this leads us to believe that Eastern was indeed naive in its procedures and unsuspecting of the potential dangers lurking behind every loan transaction. It is a well-known maxim, however, that the law protects the unsuspecting as well as the wary.
 
 
 53
 The fact that Stoy at one point stated that these loans were made solely on the appraised value of the property, can hardly be taken as an admission that a loan would be approved if the documents were found to be totally based on lies. Harrison's testimony reiterated Stoy's assertion that no loans would be considered if they were known to be based on false information. The fact that Eastern relied primarily on the value of the property does not detract from a finding of reliance as long as the defrauded party's belief in the validity of the documents was a contributing influence in accomplishing the desired results. Ciullo v. United States, supra, 117 U.S.App.D.C. at 33, 325 F.2d at 229; Gilmore v. United States, 106 U.S.App.D.C. 344, 347, 273 F.2d 79, 82 (1959).
 
 
 54
 Appellants complain, though, that Harrison and Stoy spoke mostly in general terms and did not refer much to the 17 transactions. Why the Government chose this approach is not known to this court; however, based on the evidence we have set out, we can see no reason why the jury could not have reasonably made the inference necessary to find guilt beyond a reasonable doubt. Appellants in cross-examining Stoy and Harrison could certainly have, and in fact did, elicit testimony relating to the 17 loan transactions.[10] This type of cross-examination would surely have tested the validity of their theory of the Association's general practice as well as satisfied any doubts they may have had with respect to the knowledge of Stoy and Harrison concerning the specific facts involved in our case.
 
 V. Limitations on Cross-Examination
 
 55
 Another major error appellants allege relates to the trial judge's limitation on the cross-examination of Stoy and Harrison. They claim they were forbidden by the judge from testing on cross-examination the explanation given by Eastern's officers of its general lending procedures, by eliciting from them the procedure followed with respect to the 17 transactions listed in the indictment. It is without question that appellants had a right to cross-examine the bank officers concerning the 17 loan transactions, and if we were to find that the trial judge in fact denied them this right we would be duty-bound to reverse the convictions. Nowhere do we find that the trial judge blocked specific inquiry into the loans. In fact, the judge was quite liberal in allowing answers, twice over the objection of Government counsel, (see Trial tr. 127, 133) to questions on cross-examination dealing with the specific loan transactions involved in this indictment. Stoy was allowed to answer at least 25 questions on cross-examination dealing with the specific loan transactions.[11] In their claim that they were restricted in cross-examining Stoy about the specific loan transactions, the appellants rely solely, as they must, on the trial dialogue set forth in the margin.[12] The only restriction of cross-examination concerning Eastern's general practice emanates solely from the manner in which Government counsel phrased his objection. Certainly nothing the judge said at trial indicated foreclosure of questioning concerning the specific loan transactions. It is frivolous for appellants to suggest that at that time they felt barred from eliciting testimony about the loans, inasmuch as the previous six answers (one over the objection of Government counsel) covered the specific loan transactions and moreover, the very next four answers were in response to questions concerning the particular transactions.[13]
 
 
 56
 *****
 
 
 57
 * * *
 
 
 58
 *****
 
 
 59
 * * *
 
 
 60
 *****
 
 
 61
 * * *
 
 
 62
 *****
 
 
 63
 * * *With respect to the cross-examination of Harrison there are only two instances in the transcript remotely relevant to appellants' claim. The first occurs when, after a series of questions totaling five pages of transcript by one of the defense counsel who was asking questions about financial statements disclosing Reynolds' liabilities and assets, the trial judge cut off that line of inquiry as outside the scope of the direct examination. (Trial tr. 543.) The judge certainly had a right to do so since not once was there any mention on direct examination of Reynolds' wealth, nor was there any focus on his financial statements. The judge then properly informed counsel that he was free to recall the witness to testify on these matters when it came time for the defense to present its case. It must be remembered that it is the trial judge's duty to see that the evidence is presented to the jury in as orderly and intelligible a manner as possible. To accomplish these ends the trial judge in limiting cross-examination must necessarily be entrusted with a great degree of discretion. Baker v. United States, supra, 131 U.S.App.D.C. at 36, 401 F.2d at 987 (1968); United States v. Bender, 218 F.2d 869, 874 (7th Cir. 1955); Wright v. United States, 87 U.S.App.D.C. 67, 68, 183 F.2d 821, 822 (1950). The court here was quite correct in not allowing the defense to cross-examine Harrison with respect to matters only relative to an affirmative defense and not brought into the case on direct. See Baker v. United States, supra, 131 U.S.App.D.C. at 36, 401 F.2d at 987. The other question put to Harrison that was found objectionable by the trial judge was:
 
 
 64
 Defense Counsel: Mr. Harrison, did you have any conversations with regard to this case on last Friday?
 
 
 65
 (Trial tr. 545.) To understand the basis of this question we must refer to a discussion in court between counsel and the judge moments before the witness Harrison took the stand. (Trial tr. 525-526; 529-531.) Defense counsel at that point argued that Harrison should be excluded from testifying on the ground that Harrison had engaged in certain conversations with the prosecutor concerning the testimony of Stoy. The judge properly denied this motion, but said the witness' credibility could be tested by questioning him about any discussions he had with anyone else about the case. Defense counsel's question of Harrison then was aimed at impeaching his credibility by referring to the conversation he was supposed to have engaged in with the prosecutor concerning Stoy's earlier testimony. The limitation of undue inquiry into collateral matters to test credibility is properly within the discretion of the trial judge. As this court said in Lindsey v. United States, 77 U.S.App.D.C. 1, 133 F.2d 368 (1942):
 
 
 66
 [C]ontrol of cross-examination is within the discretion of the trial judge. . . .
 
 
 
 * * *
 [U]ndue inquiry into collateral matters to test credibility, and the like, [on] cross-examination is properly within the discretion of the trial judge, and there can be no reversal except for abuse.
 77 U.S.App.D.C. at 2, 133 F.2d at 369. This position has been cited with approval. See Wright v. United States, supra, 87 U.S.App.D.C. at 68, 183 F.2d at 822. The trial judge here required, and reasonably so, that the defense show some sort of contradiction between the testimony of Stoy and Harrison before allowing the contradiction of Harrison in this manner. It was in this context then that the dialogue, which is set forth in the margin,[14] concerning the objectionable question propounded to Harrison, arose. Admittedly, the discussion we refer to in the margin is rather confusing, which perhaps is in part the result of a faulty transcript. However, it is clear that the discussion centered around whether or not there was sufficient contradiction between the witnesses' testimony to allow the type of attack defense counsel wished to make on the credibility of Harrison. If defense counsel had wanted to ask the questions it now claims it was prevented from asking, we do not think the above discussion would have intimidated defense from further inquiry into the 17 specific loan transactions but merely diverted counsel from asking the witness about conversations with the prosecutor. As a matter of fact, only a few minutes later Harrison was asked and, with no objection from the judge or Government counsel, responded to questions concerning documents relating to two of the specific loan transactions. (Trial tr. 562-563.) Certainly at this point any trepidations defense counsel might possibly have had about delving into the 17 specific loan transactions were assuaged. In view of the above, we can find no abuse of discretion by the trial judge in handling the cross-examination.
 VI. The District Judge's Refusal to Grant Appellants' Motion
 to Suppress Certain Evidence
 The District Judge denied all motions to suppress evidence obtained by virtue of the interviews and examinations outlined above. He denied appellants' claims made under the Fourth Amendment on the ground that "the use of [a civil tax] statute to inspect books and records for both civil purposes and possible criminal prosecution does not constitute that fraud and deceit which characterize a search and seizure as unconstitutional." Brief for Appellant Reynolds at 22a. With regard to the Fifth and Sixth Amendment assertions, the District Judge held that suspects in criminal cases arising out of tax investigations are entitled to be advised of their constitutional rights "when the accusatory stage is reached and the adversary process begins to operate," Brief for Appellant Reynolds at 21a, but he asserted that this stage had not been reached with respect to Appellants Freeman and Rogers at the time of their interviews.
 Let us examine the appellants' Fourth Amendment claim that their valid consent to the inspections and examinations under consideration in this case was lacking. It is important to keep in mind the significant difference between the normal search made in a criminal case and the search made in a tax investigation. The typical criminal search is exemplified by a police officer knocking on the defendant's door, either figuratively or literally, thereby putting the occupant on notice as to the criminal nature of the search. The tax audit, on the other hand, is conducted by a plainclothesman of the Internal Revenue Service who is primarily interested in a civil matter; the taxpayer thus may be unaware of the possible criminal repercussions of his investigation. It is appellants' contention that this difference fundamentally affects the nature of the consent given to the search.
 This contention is raised frequently in tax fraud cases, and an important consideration in many of these cases has been whether the audit had developed into a criminal investigation at the time the incriminating evidence was discovered. If evidence is uncovered in the so-called first stage of the investigation, "in which the agent has no suspicion of fraud beyond his normal awareness that fraud may be uncovered in any case under investigation," Note, Fifth Amendment Right to Counsel in Federal Income Tax Investigations, 19 Stan.L.Rev. 1014, 1022 (1967), it is generally admitted without regard to circumstances. See United States v. Spomar, 339 F.2d 941 (7th Cir. 1964) cert. denied, 380 U.S. 975, 85 S.Ct. 1336, 14 L.Ed.2d 270 (1965); Hanson v. United States, 186 F.2d 61 (8th Cir. 1950). Because there is no suspicion of criminal behavior at the time the investigation is made and because there is little chance that the audit will lead to criminal prosecution, Duke, Prosecutions for Attempts to Evade Income Tax: A Discordant View of a Procedural Hybrid, 76 Yale L.J. 1, 34-35 (1966), the courts hold that the taxpayer's consent was not obtained through fraud or misrepresentation.
 Where the evidence is obtained during the second stage, "in which the agent does suspect fraud in the particular case at hand and is seeking to uncover evidence of wrongdoing for a possible criminal prosecution," Note, supra, at 1022, there is some conflict in the decisions. The majority of the decided cases hold that the Government is under no duty to disclose the changed nature of its investigation, so evidence which is gathered during the second stage is admissible if valid consent was given during the first stage. United States v. Sclafani, 265 F.2d 408, 415 (2d Cir.) cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959); see Turner v. United States, 222 F.2d 926 (4th Cir. 1955); United States v. Burdick, 214 F.2d 768 (3rd Cir. 1954). A primary factor in these decisions was the fact that the revenue agent did not mislead the taxpayer at the time he obtained his consent. See United States v. Wheeler, 149 F.Supp. 445, 450 (W.D.Pa.1957) reversed and remanded on procedural grounds, 256 F.2d 745 (3rd Cir. 1958). Another rationale given for this line of reasoning has been that the taxpayer must know that the civil audit might well ripen into a criminal prosecution. This reasoning is valid when applied to accountants, businessment and other sophisticated taxpayers, but considering the very small number of civil cases that develop into criminal ones, it is questionable whether the typical taxpayer realizes the criminal implications of a tax audit. Duke, supra, at 36. See generally United States v. Sclafani, supra, 265 F.2d at 414-415. Finally, at least one court has felt it would be impossible for the Government "to keep a taxpayer advised as to the direction in which its necessarily fluctuating investigations lead." United States v. Sclafani, supra, 265 F.2d at 415. However, we feel that generally it is within the Government's capabilities to know when its investigations have become criminal.
 A few courts have held that any evidence obtained in the second stage must be suppressed. See Application of Bodkin, 165 F.Supp. 25 (E.D.N.Y.1958); United States v. Guerrina, 112 F.Supp. 126 (E.D.Pa.1953), modified 126 F.Supp. 609 (E.D.Pa.1955). These courts have reasoned that the taxpayer intended to consent only to a search for evidence of civil liability and that he had no intention of consenting to the additional search for evidence of fraud.
 A few other cases have established a middle ground between Sclafani and Guerrina. The courts deciding these cases have looked at the particular facts involved in the tax investigation in order to determine whether the scope of the investigation exceeded that necessary for a civil tax audit. United States v. Lipshitz, 132 F.Supp. 519 (E.D.N.Y.1955), or that the Internal Revenue agents had misled the taxpayer to believe the audit remained exclusively civil. United States v. Wolrich, 129 F.Supp. 528 (S.D.N.Y.1955). Although these cases were rejected in the Sclafani opinion, 265 F.2d at 414, Sclafani really did not undertake a careful analysis of these cases. It should be noted that Wolrich and Lipshitz are not necessarily inconsistent with the holding in Sclafani.
 The case before us presents a factual situation different from either the first stage or second stage cases. Here, the Internal Revenue agents were conducting valid civil tax audits of the principals in our case, but, it is clear they were also seeking, at least tangentially, evidence of criminal behavior from the inception of the investigations. To our knowledge there is only one case with the same factual pattern, United States v. Wheeler, supra. In Wheeler, the Court held that the evidence was seized in violation of the Fourth Amendment. The Court distinguished the cases where evidence was seized during the second stage on the ground that in those cases the agent conducting the search had not misstated his purpose when he initially obtained consent during the first stage, whereas the agent in the case before it had misrepresented his purpose to some extent. United States v. Wheeler, supra, 149 F.Supp. at 450. There are, however, a few cases which have held that it is permissible under another portion of 26 U.S.C. Sec. 7602[15] to require a taxpayer to produce his records even when the investigation is criminal as well as civil, McGarry v. Riley, 363 F.2d 421 (1st Cir. 1966); Wild v. United States, 362 F.2d 206 (9th Cir. 1966); Boren v. Tucker, 239 F.2d 767 (9th Cir. 1956); and these cases tend to indicate that evidence obtained in such an investigation as a result of the taxpayer's not wholly-informed consent would be admissible. One rationale given for these decisions has been that the relevant language of section 7602 does not state that the procedure can be used only in investigations which are exclusively civil, and it can thus be used in investigations which are both civil and criminal. Boren v. Tucker, supra, at 772.
 We believe the reasoning in these cases to be sound and well considered. There is no disputing the fact that section 7602 is subordinate to the Fourth Amendment; it is this fact which leads us to believe that the intent of Congress was to provide for use of that statute within the mandates of the Constitution. As each of the cases upholding a record summons in joint civil and criminal investigations points out, the possibility of a criminal action germinating from a civil audit is inherent in the procedure. See McGarry v. Riley, supra, 363 F.2d at 424; Boren v. Tucker, supra, 239 F.2d at 772. This proposition, however, cannot be applied to non-taxrelated crimes. In our case, the investigation was of returns, books and other documents which belonged to a sophisticated businessman or professional. The appellants were not the uninitiated who could be said to be unaware of the possible consequences of a civil tax audit. As builders, accountants, attorneys and people engaged in the real estate industry they were acutely aware of the possibilities of a criminal prosecution stemming from the civil audit.
 In our opinion, neither Wheeler nor the record summons cases are clearly determinative of our case and we must analyze the reasoning of the second stage cases to reach a solution. To begin with, let us examine the applicability of the "middle ground" cases. These cases are based on the sound principle that any misleading elements other than those inherent in the nature of a tax investigation are certain to affect the validity of the consent given. Our task will be simplified if the specific facts of the examinations and inspections at issue here indicate the presence or absence of additional misleading statements.
 We consider first the audit of Reynolds Construction Company by Revenue Agent Evangelist. George R. Steele, an employee of the company consented to this audit and one factor to be examined in determining whether he was "deluded" into giving his consent is what Revenue Agent Evangelist told him the purpose of the search was. If Evangelist assured him it was simply a routine civil audit, he would have been misleading Steele to some extent since the audit was at least in part a search for criminal evidence. See United States v. Wolrich, supra. The testimony on this point is in conflict. Steele contends that Evangelist told him it was a routine tax audit. (J.A. 34.) Evangelist, on the other hand, contends that he did not use the word "routine". (J.A. 37.) In testimony, in fact, Agent Evangelist stated that as a practice he "never used the word routine in any audit" he performed. (J.A. 37, emphasis added.) Taking this testimony into account as being explanatory of Evangelist's regular practice and considering that Steele was an accountant can only lead us to the conclusion that as a man of considerable experience in the world of finance Steele was aware of the potential criminal aspects of the civil audit. This would be so even if Evangelist said nothing about the partial criminal nature of his investigation. It is not possible for us to conceive of a situation in which a firm's accountant would likely be put off his guard by a Government agent seeking to inspect the firm's financial books and records.
 In determining the validity of Steele's consent we must consider whether Evangelist's examination was within the permissible scope of a civil tax audit. If the examination was beyond the scope of the civil audit then it could be said that it was beyond the scope of Steele's consent. See United States v. Lipshitz, supra. We do not believe that in light of the facts of this case, Evangelist exceeded the proper bounds of a civil audit. While he was testifying Evangelist stated that "one of [his] duties was to obtain all of the financial transactions between Reynolds and Leigh." (J.A. 41; see also J.A. 47, 51), and that he was to do so because Reynolds was suspected of bribing Leigh. Pursuant to his instructions Evangelist obtained sales contracts and refinancing statements pertaining to the "straw" transactions here at issue. (J.A. 43.) Each of these documents was obtained from George Steele, Reynolds' accountant, who could have questioned the scope of Evangelist's investigation at any time. We are not dealing here with a situation in which the Government obtained its information by stealing through the night; on the contrary, all of the information in question was examined during the civil audit and unquestionably pertained to that audit. If Steele felt at any time that Evangelist had exceeded the bounds of his audit in making a given request for records he could have refused to make such records available to him. According to Steele's own testimony Evangelist worked with him in the same room (J.A. 30), and Steele had the opportunity to watch him and speak with him at any time he desired during the course of the audit. Steele understood Evangelist's requests for records and knew the purpose of his visit; if he believed for one moment that Evangelist was not in fact conducting a civil audit or if he was not satisfied with the nature of his requests, or if he thought that his requests were beyond the bounds of the civil audit, he could have acted. He never chose to do so. Thus, the investigation of Reynolds Construction by Evangelist was within the proper scope of the civil audit and the evidence obtained in this search should not have been suppressed.[16] Special Agent McElroy obviously acted innocently in making the statements that he did, not realizing that they could mislead Rogers or intending to do so. Rogers' consent to the inspection of the partnership records in his possession was valid and evidence obtained as a result of that inspection should not have been suppressed. When he began his investigation McElroy was apparently unaware of Rogers' role in the drama that was about to unfold. Rogers was in a better position at the time than McElroy to postulate on his own possible future involvement. McElroy did not fully inform Rogers of the nature of the Leigh criminal investigation; however, he certainly had no duty to do so. Rogers was informed that Leigh was being investigated for tax fraud, although no mention was made of bribery.
 We, likewise, believe that the audits of both Freeman and Rogers were untainted. The investigation of Freeman stemmed directly from Evangelist's findings in his audit of Reynolds, and at the time of this search it is not possible to determine which information uncovered would be classed as civil and which criminal. The information stemmed from a civil audit and thus will not qualify as "fruit of the poisonous tree." We do not believe that the investigation of Freeman exceeded the proper bounds of a civil tax audit. The Rogers investigation, as we said above, came after McElroy explained his investigation and purpose. He knew of all of the possible ramifications of this search prior to granting his consent. Furthermore, the Government was not at the time seeking evidence to incriminate Rogers. When such evidence was uncovered, however, it was admissible and there is no reason for its suppression.
 Special Agent McElroy's action in obtaining records of the Leigh-Rogers partnership presents a fact pattern quite different from the tax investigation of the Reynolds Construction Company. McElroy notified Leigh that he was engaged in a criminal investigation; the difficulty is that he assured Rogers he was investigating only Leigh. As McElroy testified:
 I was not investigating him [Rogers], I told him I was not investigating him, and I also tried to make it clear to him that I definitely was not doing it.
 (Trial tr. 126). The question presented is thus whether this statement was misleading to the extent that it vitiates Rogers' consent to the search. We feel that it was not. McElroy did not say that any evidence obtained would not be used against Rogers, and while McElroy was only investigating Leigh at the time Rogers was on notice as to any joint transactions in which he participated with Leigh.
 Finally, we consider the initial search involved in this case, that is, the tax examination of defendant Leigh which took place prior to his being informed of the criminal nature of the investigation in January 1964.[17] While we have not found evidence of misleading circumstances with regard to the searches discussed above, we find even less evidence of potentially questionable events and conduct with reference to this search. The record shows that Revenue Agent Hansell treated the examination as a routine audit (Trial tr. 232), and we have no indication that the scope of the examination exceeded that of a routine audit in any way. Hansell refrained from inspecting the settlement files pertaining to the "straw" transactions until Leigh had been notified that he was a criminal suspect. (Trial tr. 218-224.) In addition, there were no special agents operating behind the scenes while Hansell concluded the audit. (Trial tr. 230.) Hansell did tell Leigh that the investigation was a routine audit and did not indicate to him that it was initiated as the result of an informer's tip alleging that Leigh was involved in accepting certain bribes. (Trial tr. 290-291.) We see no reason why Hansell should have said more. See Wild v. United States, supra; Boren v. Tucker, supra; McGarry v. Riley, supra.
 We do not feel that this partial withholding by Hansell vitiates Leigh's consent in any manner. The investigation of Leigh was potentially criminal in nature but when the search was made there was nothing in the hands of the Government which substantiated the information provided by the informer. When the Government is presented with information by an informer in a case as complicated as the case at bar it would be a mistake for them to proceed with the matter as a "criminal" prosecution until there was time to investigate all of the allegations. No one suggests that the Government should have approached the grand jury for an indictment at this stage; nor is there any suggestion that the matter should have been handled by a special agent at this stage. The Government's sole information was a tip from an informer. There is no information as to the reliability of the source. It was unnecessary to bring these facts to Leigh's attention since if they were true, disclosure of a potential investigation at this time could unnecessarily hamper and inhibit the Government's investigation, and if false, the suggestion of participation in illegal activities would have been uncalled for based on the naked allegations of an informer without solid investigative substantiation.
 We do not comment on the reasoning of the Wheeler court; as we do not believe that case to be applicable to the case at bar. Indeed, it is a close question as to whether evidence obtained in the second stage of a typical tax investigation is admissible when there is no notification to the taxpayer of the partial civil-partial criminal foundation for the investigation. The common second stage case situation involves an agent obtaining consent in the first stage without any misrepresentations to the taxpayer. This is precisely the close question we find in the instant case. When dealing with persons as sophisticated as the defendants and appellants in our case it is not possible to believe that they lacked full realization that the civil tax audit could ripen into a tax fraud investigation and, in light of these acts, a criminal non-tax probe. While the normal taxpayer might not suspect the possibilities of this occurring we are not dealing with the ordinary taxpayer but rather with people well versed in finance, taxation and the law.
 For these reasons, then, we hold the evidence obtained as a result of the examination of Leigh prior to his being advised of his rights as a criminal suspect admissible.
 VII. The Fifth and Sixth Amendment Claims
 Lastly, appellants Rogers and Freeman argued that the interviews conducted by the Internal Revenue agents of them were conducted in violation of both the Fifth and Sixth Amendments to the Constitution because appellants were not given the Miranda warnings. We note, and there is little disagreement, that Miranda warnings are not required at the outset of every civil tax audit as a condition precedent to the introduction of information elicited from a taxpayer. See Spinney v. United States, 385 F.2d 908 (1st Cir. 1967) cert. denied, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968); Frohmann v. United States, 380 F.2d 832 (8th Cir.) cert. denied, 389 U.S. 976, 88 S.Ct. 478, 19 L.Ed.2d 469 (1967); Schlinsky v. United States, 379 F.2d 735 (1st Cir.) cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967); United States v. Maius, 378 F.2d 716 (6th Cir.) cert. denied, 389 U.S. 905, 88 S.Ct. 216, 19 L.Ed.2d 219 (1967); United States v. Mancuso, 378 F.2d 612, modified, 387 F.2d 376 (4th Cir. 1967) cert. denied, 390 U.S. 955, 88 S.Ct. 1051, 19 L.Ed.2d 1149 (1968); Selinger v. Bigler, 377 F.2d 542 (9th Cir.) cert. denied, 389 U.S. 904, 88 S.Ct. 212, 19 L.Ed.2d 218 (1967); Morgan v. United States, 377 F.2d 507 (1st Cir. 1967); Rickey v. United States, 360 F.2d 32 (9th Cir.) cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 69 (1966); Kohatsu v. United States, 351 F.2d 898 (9th Cir. 1965) cert. denied, 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966); United States v. Spomar, supra; United States v. Jaskiewicz, 278 F.Supp. 525 (E.D.Pa.1968); United States v. Mackiewicz, 274 F.Supp. 805 (D.Conn.1967); United States v. Neves, 269 F.Supp. 158 (S.D.N.Y.1967); United States v. Gleason, 265 F.Supp. 880 (S.D.N.Y.1967); United States v. Hill, 260 F.Supp. 139 (S.D.Cal.1966); United States v. Fiore, 258 F.Supp. 435 (W.D.Pa.1966); Note, supra; Duke, supra. In Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) the Court held: "We reject the contention that tax investigations are immune from the Miranda requirements for warnings to be given a person in custody." (Emphasis added.) Id. at 4, 88 S.Ct. at 1505. The decisions in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) certainly do not require that warnings be given in this situation. As Mathis stated, these decisions only deal with situations in which an individual is in custody. See Miranda, supra, 384 U.S. at 467, 471, 477, 86 S.Ct. 1602. Moreover, there is little need for these warnings, for, as we have said the possibility that the audit will turn into a criminal investigation is very small. Finally, it appears that the tax laws will be better administered and the rights of individuals will receive more protection if the so-called Miranda warnings are given with a degree of selectivity rather than uniformly. See Duke, supra, at 38-39.
 The question thus presented is, if Miranda warnings are to be given at least at some stage of some tax investigations, must they have been given to Rogers and Freeman at the time in question here? We do not believe so. The Miranda warnings were primarily designed to protect an individual from physical or mental coercion exerted in order to extract a confession from him. The facts surrounding the interviews of Rogers and Freeman do not indicate that there was any coercion present. Neither was in custody or detained in any way, and the individuals conducting the interviews were revenue agents who presumably were not trained in the interrogation techniques condemned by the Supreme Court in Miranda. It is our view that the trial judge handled the entire Miranda issue with great care and sensitivity, and we both accept and endorse the conclusions of the trial judge on this point. See Appendix to Brief of Appellant Reynolds at 12a. Given these circumstances, we do not believe Rogers and Freeman were entitled to the Miranda warnings at the times they suggest.
 There remains, however, the question whether information obtained in the interviews with Rogers and Freeman was inadmissible under the Fifth Amendment because it was not given voluntarily. This question is to be resolved through the use of the same principles discussed above with regard to the Fourth Amendment, for in both instances the issue is whether the taxpayer was "deluded" into acquiescing. The Fifth Amendment would in fact appear to be applicable to both situations, because the evidence obtained from a taxpayer during an examination of his books should probably be considered testimonial. See Note, supra, at 1021-1022.
 Applying the principles enunciated above with regard to the Fourth Amendment, it is evident that the information which Rogers and Freeman related to the Internal Revenue agents was given of their own free accord and was fully voluntary. Both appellants were fully apprised of the transactions in which they were involved and knew of the possible consequences of the civil tax audit. Those involved in criminal activities cannot volunteer to give information concerning cohorts in the same transaction and then claim to be unaware of the true nature of an investigation when the investigators' attention is turned in their direction. When McElroy approached Rogers he was not under suspicion; when Freeman spoke with Evangelist he was the subject of a valid civil tax audit. Consequently, evidence obtained from these interviews, as well as that gathered in the inspections and interviews we have discussed above were correctly admitted into evidence by the trial judge. Finding no error the conviction of the District Court is
 Affirmed.
 BAZELON, Chief Judge (concurring):
 The fundamental office of Miranda v. Arizona[1] is to insure that a suspect's cooperation with the police does not rest on ignorance or a mistaken understanding of his constitutional rights. In requiring disclosure to the suspect that he need not answer any questions, that his answers can be used against him, and that he has a right to the assistance of counsel, the Supreme Court attempted to guarantee that the poor and the uninformed would understand their rights no less than the sophisticated and the affluent, and that waivers of their rights would not proceed from ignorance. The decision was not designed to establish new rights, but rather to insure that the exercise of pre-existing rights would not turn solely on the intellectual or financial resources of the suspect.
 No one has ever pretended that Miranda's crucial and essentially uncomplicated objective could be easily or quickly achieved. After all, a defendant who was ignorant of his rights before hearing the Miranda warnings may easily misunderstand them if they are "explained" in a grudging or confusing manner, or if they are offered in a context so rank with hostility and coercion that the suspect immediately recognizes them as sham. Without the sustained vigilance and probing of the lower courts, wealth and intelligence will continue to control the exercise of fundamental rights.
 After more than five years of experience with Miranda it seems clear that the critical struggle is not so much to insure that the warnings will be given, as to guard against the subtle dismantling of Miranda by those who would give credit to waivers which are neither knowing nor intelligent. This case presents a Miranda question far removed from the flash point of the current controversy. Indeed, some might argue that Miranda was not even designed to provide additional protection to this type of defendant. Its principal objective, it could be said, was to guarantee that all defendants would be able to exercise the same rights which wealthy and informed defendants have long possessed. But while judicial vigilance is most required where the suspect lacks the experience, mental capacity, or legal advice to make an informed appraisal of his rights, it bears emphasis that Miranda cannot be gutted or treated cavalierly where the suspect is rich and powerful and sheltered by the high-priced assistance of counsel. Miranda established an across-the-board prophylactic rule which rests on the assumption that all suspects should understand their rights and that no one should be presumed to have the necessary understanding in advance of hearing his rights. That rule is fully applicable to this case.[2]
 I am in complete agreement with the conclusion of the Court and of the court below that each defendant was advised of his rights as soon as a general investigation gave way to a search for information that would support a criminal charge against him. In addition to the court's analysis, I only wish to add that the record in this case makes it clear that the suspects were not only given the necessary warnings, but also that those warnings-and the rights they described-were fully understood. This Court is not therefore, compelled to rely on ambiguities, strained inferences or flimsy presumptions in concluding that Miranda's objectives were realized. The distressing irony, of course, is that we rarely enjoy such assurance in cases where the defendants are even more in need of Miranda's protection.
 
 
 [1]
 Dienelt was found not guilty and hence was without reason to join in this appeal. Defendant Leigh chose to file no appeal
 
 
 [2]
 The distinction between Revenue Agents and Special Agents should be noted. The Revenue Agent performs civil tax audits while the Special Agent is involved in investigations which are criminal in nature from their inception. From time to time criminal matters will be uncovered by Revenue Agents in the course of a civil tax audit; when this occurs such matters are brought to the attention of a Special Agent
 
 
 [3]
 The Section 1952 procedure is explained at pp. 776-777, infra
 
 
 [4]
 If Hansell suspected that Rogers was criminally involved with Leigh, it stands to reason that a Special Agent would have been ordered to review his tax returns rather than a Revenue Agent. It is apparent to the court therefore, that at least at the time Rogers was subjected to a tax audit he was not suspected of any criminal activities by "Metro." Therefore, the fact that Rogers was never told he was a suspect or given his rights has no particular significance since he was not apparently under suspicion
 
 
 [5]
 A title binder indicates the current owner of the property, the future owner, and the maker of the trust. (J.A. 83.)
 
 
 [6]
 Rule 12. Pleadings and Motions Before Trial; Defenses and Objections
 (b) The Motion Raising Defenses and Objections.
 (2) Defenses and Objections Which Must Be Raised. Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding.
 
 
 [7]
 [I]nsofar as Rule 12 is concerned, it has been consistently construed that failure to bring all of the matters with respect to procedural defects in the grand jury to the attention of the Court at the time any motion is made with respect to the grand jury proceeding, including all of those matters which either were in fact known or could have been with due diligence discovered, effect a waiver. And in this situation it was the judgment of the Court, as announced in the opinion, that to bring this motion under these conditions and with these facts before the Court at the time it was brought, did not justify setting aside any waiver. In fact, a waiver had been in effect since the original motion for dismissal of the grand jury was argued by counsel and joined in by all other counsel, almost a year ago. (Emphasis added.)
 (J.A. 76-77.)
 
 
 [8]
 Mr. Swain testified as follows:
 Q. [T]he document in the file of this case indicates that on April 28, May 5, May 12, June 23 and September 22, 1967, the grand jury met on this case. Does that conform roughly to your recollection?
 A. Right. The dates may not be-I can't recall the dates but that sounds about the right time.
 (J.A. 64.)
 
 
 [9]
 Appellant Stamp was the agent involved in this case and Eastern had dealt with him on several previous occasions
 (Trial tr. 561.)
 
 
 [10]
 Appellants claim they were unduly limited by the trial judge in their ability to cross-examine. We discuss this contention next
 
 
 [11]
 Some of the typical questions and answers are set out here
 Defense Counsel: Did you in 1962 in fact have knowledge that the 17 people named by Mr. Molenof and their wives did in fact exist?
 Mr. Stoy: I personally didn't have any knowledge, no, sir.
 (Trial tr. 126.)
 Defense Counsel: You testified, I believe, that the papers in these transactions came to Eastern Savings and Loan through an agent; is that correct?
 Mr. Stoy: Yes, sir.
 (Trial tr. 128.)
 Defense Counsel: Did these appraisers in each of these 17 transactions place in your records a signed written appraisal?
 Mr. Stoy: Yes, sir.
 (Trial tr. 129-30.)
 Defense Counsel: Could you tell the jury approximately how much you loaned on each of these transactions?
 Mr. Stoy: I would say 80 percent at the most.
 (Trial tr. 130.)
 Defense Counsel: Now, I understand you to testify that the procedure at your institution at that time, the general procedure was as you outlined it here. Was the procedure that you followed in these particular cases the same procedure?
 Mr. Stoy: To the best of my knowledge, the same procedures followed in all loans by Eastern.
 (Trial tr. 131.)
 
 
 [12]
 Defense Counsel: How were payments made on these mortgage transactions?
 Mr. Stoy: I could not answer that, sir. I am not familiar with the payments.
 Defense Counsel: Are you presently the secretary of Eastern Savings and Loan?
 Mr. Stoy: Just the last two months.
 Defense Counsel: Do you have access to the records of Eastern Savings and Loan?
 Government Counsel: I object on the ground this is outside of the direct. He was asked about general practice.
 The Court: Sustained.
 (Trial tr. 127-28.)
 
 
 [13]
 In the District Court's opinion, written some seven and one-half months after the testimony, denying defendants' motions for post-trial relief, the trial judge mistakenly thought that in this instance he had prevented cross-examination with repect to the specific transactions. See Appendix to Appellant Reynolds' Brief at 32a. With all due respect, we feel the trial judge was apparently confused as to what he had in reality prevented at this point in the tedious and complicated trial. It appears he was merely exercising the "large measure of discretion", Baker v. United States, 131 U.S.App.D.C. 7, 36, 401 F.2d 958, 987 (1965), entrusted to him in limiting cross-examination to Eastern's policy of granting loans and not the paying of these loans. It is clear, though, as explained in the text, that appellants were not barred from asking about the 17 loan transactions
 
 
 [14]
 Counsel for Reynolds: Mr. Harrison, did you have any conversations with regard to this case on last Friday?
 Government counsel: I object.
 The Court: Sustained. Come to the bench.
 (At the Bench)
 The Court: Your questions can only be proper in the event he testifies to something that contradicts something that Mr. Stoy had said. Mr. Molenof never went into this. He testified according to what his-
 Counsel for Reynolds: I believe he did. He testified they made loans on the basis of appraisals.
 The Court: This witness never said anything to contradict him.
 Counsel for Reynolds: If he knew they were false, they wouldn't make a loan. That is a direct contradiction, Your Honor.
 The Court: Mr. Molenof didn't open it up.
 Counsel for Reynolds: Your Honor, I certainly indicate this witness was influenced by the discussion of the testimony before this Court with Mr. Stoy. Now, his testimony is different than Mr. Stoy in that respect Mr. Stoy said appraisals. That is why we made the loan. By inference, the jury is clearly led to believe that had they known of these things, they would have made no loan. I think it is direct contradictory. [Sic.]
 Government counsel: No contradiction for the simple reason that Stoy made a particular statement on rebuttal, and I have the transcript here, indicating they initially considered the application not knowing they contained false information or false sales-
 Counsel for Reynolds: That contradicts Mr. Stoy's testimony.
 Government counsel: It didn't contradict his testimony. He would not make a loan on false sales and false information. I don't think he contradicted him.
 Counsel for Leigh: Your Honor, may I say he testified, and there was a general question as to what specific testimony related to the property, and that has never been touched.
 The Court: It certainly hasn't. He has never been asked any question about any knowledge of any one of the 17 transactions.
 Counsel for Dienelt: I got the same inference out of the question.
 The Court: I can't help it. It might be an inference from a million other propperties. The whole examination, the principal examination of this witness had to do with general practice of Eastern Savings and Loan, and not once did he testify to the 17 transactions. If he had, I would permit as indicated some challenge to the question as to his credibility. He had not gone into it. I will not permit it. I will stand on my ruling. (Trial tr. 545-547.)
 
 
 [15]
 Sec. 7602. Examination of books and witnesses
 For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized-
 (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;
 (2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and
 (3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.
 26 U.S.C. Sec. 7602 (1964).
 
 
 [16]
 Since this evidence was admissible against Reynolds we need not reach the question of whether the other defendants had standing to raise the issue of the legality of the search
 
 
 [17]
 While Leigh did not appeal his conviction we feel that it is important to discuss the search of his records, since any error here could be prejudicial to all of the other appellants because the balance of the Project investigation stemmed largely from findings here
 
 
 [1]
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)
 
 
 [2]
 Because of the special nature of an income tax fraud investigation the Miranda warnings have special significance here notwithstanding the sophistication of the defendants. For no matter how familiar they were with their rights, their exercise of those rights may have depended in part on their understanding of the government's intentions. Thus, a taxpayer may be willing to cooperate with a routine tax audit while he would have withheld his cooperation if he had understood that the government had already decided to press a criminal charge. Yet until he receives the Miranda warnings the taxpayer may have little understanding of the peril of his position